BALDWIN, J.
The decision of the Court of Appeals is reversed. The case is remanded to the Employment Relations Board for further proceedings.
Landau, J., dissented and filed an opinion, in which Balmer, C. J., and Brewer, J., joined.
*811 BALDWIN, J.
This case requires us to consider whether the City of Lebanon (city) committed an unfair labor practice under Oregon’s Public Employee Collective Bargaining Act (PECBA), ORS 243.650 - 243.782, when one of its council members, Campbell, wrote a letter to a local newspaper disparaging labor unions in general and calling for city employees to decertify their existing union. The Employment Relations Board (ERB or board) concluded that the city had engaged in an unfair labor practice based on Campbell’s conduct. The Court of Appeals reversed, concluding that the city was not liable because Campbell had not acted as a “public employer or its designated representative” within the meaning of PECBA. AFSCME Council 75 v. City of Lebanon, 265 Or App 288, 336 P3d 519 (2014). For the reasons explained below, we reverse the decision of the Court of Appeals, and remand to ERB for further proceedings.
I. BACKGROUND
The undisputed facts, as summarized by the Court of Appeals, are:
“According to the City of Lebanon Charter of 2004, the city is ‘a municipal corporation’ that includes ‘all territory encompassed by its boundaries * * *.’ The city is also a public employer as defined by ORS 243.650(20). All powers of the city are vested in the city council, which is composed of a mayor and six councilors; the council delegates much of that power to the city administrator (manager), who is the ‘administrative head of the government of the City.’ Specifically, the city administrator (manager) is ‘responsible for the daily operation of the City’s departments and implementation of Council policy.’
“The council is responsible for holding regular meetings, adopting ‘rules for the government of its members and proceedings!,]’ and appointing certain city officers. The council is also responsible for passing ordinances and voting on questions before it, including whether to approve ‘a bond of a City officer or a bond for a license, contract or proposal!.]’ Except as the city charter provides, ‘the concurrence of a majority of the members of the Council present and voting at a Council meeting shall be necessary to decide any question before the Council.’ Further, ‘[n]o action by the council *812 shall have legal effect unless the motion for the action and the vote by which it is disposed of take[] place at proceedings open to the public.’
“Campbell was appointed as a city councilor in 2010 and was a member of the budget committee. As a city councilor, she would 'be asked to vote and ratify any collective bargaining agreement with the Union that [was] negotiated by the City negotiation team.’ However, Campbell was not a member of the city’s labor negotiation team, and, [o]ver the last 10 years, no city councilor [had] been a member of the City’s labor negotiation team.
“At the time of the events giving rise to this case, the city was experiencing a budget crisis, and the city and the union were parties to a collective bargaining agreement that was set to expire. The president of the union, along with the president of another union that represents city employees, co-authored a letter to the city. In that letter, the union presidents stated that the city should consider eliminating the positions of assistant city manager/human resources manager and human resources assistant before cutting essential services or laying off union workers.
“Shortly thereafter, Campbell sent a letter to the Lebanon Express, a local newspaper. The letter was addressed to All Citizens of Lebanon].]’ Campbell began the letter by stating:
“T would like to inform all of you about some elements of my personal background before I get to the basis of my letter. Further I would like to clarify this letter is being written by me as an individual and not a reflection of a majority of the City Council, the City or my employer.’
“Campbell then described her and her family’s involvement with unions, defended the city’s human resources positions, and criticized unions in general. Campbell concluded the letter by stating:
“‘To employees of the City and other organizations imprisoned by the dictatorship of a union as a private citizen I advise you to seek out the Department of Labor website where you can find instructions on how to de-certify your union captors. As an individual and former union member I believe you can put your union dues to better use in your own household budget and in supporting causes that truly express your own values.’
*813 “‘Sincerely/
“‘Margaret A. Campbell’
“‘City Councilor’
“‘Ward II’
“The newspaper published an article that summarized Campbell’s letter. That article noted that the letter could be found on the newspaper’s website and stated that Campbell planned to read the letter at a city council meeting. The parties later stipulated that Campbell did not read the letter at the meeting.”
City of Lebanon, 265 Or App at 289-91 (alterations in original).
As a result of Campbell’s conduct, AFSCME Council 75 (union) filed an unfair labor practice complaint against the city, alleging that Campbell’s comments were made in her official capacity as a council member. The parties submitted the case on stipulated facts directly to ERB. The board concluded that the city violated PECBA when Campbell, in her letter, advised city employees “to seek out the Department of Labor website where you can find instructions on how to de-certify your union captors.”[1] The board issued a cease- and-desist order and required the city to post an official notice of its wrongdoing. See ORS 243.676 (authorizing such remedy when unfair labor practice established). The board reasoned that a “public employer [under the PECBA] is liable for the actions of its officials” and that, because Campbell “spoke as the City’s representative, liability for her remarks is ascribed to the City.” The board observed that Campbell was “a member of a six-person Council in which the City Charter vests all powers. The Council is the public employer!,] and Campbell shares that status because she is a member of the Council.” (Emphasis in original.) The board further noted that Campbell, “as a member of the council *814 that is responsible for formulating all City policies and overseeing all City operations, is a public employer.”[2]
In the Court of Appeals, the city assigned error to ERB’s conclusion that Campbell acted as a public employer or its designated representative under PECBA when she submitted her letter to the newspaper.[3] The Court of Appeals agreed with the city and reversed. The court concluded that Campbell was not the city’s “designated representative” within the meaning of PECBA, because the record lacked any evidence that the city had “specifically designated” Campbell to act as its representative. City of Lebanon, 265 Or App at 295-96. Further, the court concluded that Campbell could not be a “public employer” under PECBA, because she was not acting as an agent when she submitted her letter to the local newspaper:
“The union raises an interesting question by asserting that we should apply agency principles in this case: whether a public employer can be liable for an unfair labor practice committed by an agent other than its designated representative. However, we need not resolve that question because, even assuming without deciding that it is appropriate to apply agency principles in this context, we conclude that Campbell was not acting as the city’s agent when she wrote and sent her letter.”
Id. at 297 (footnote omitted).
*815 We accepted the union’s petition for review to determine whether Campbell was either a “public employer” or a “designated representative” of the city under PECBA when she submitted her letter to the newspaper. On review, the city does not challenge ERB’s conclusion that the portion of Campbell’s letter urging city employees to decer-tify their union would constitute an unfair labor practice under ORS 243.672(l)(a) and (b) if committed by “a public employer or its designated representative.” The only issue for us to resolve, therefore, is whether the city may be held liable for Campbell’s actions because she was either a “public employer” or its “designated representative” within the meaning of PECBA.
II. ANALYSIS
A. Purposes of PECBA and the NLRA
We begin our analysis by briefly examining the legislature’s purpose in enacting PECBA. This court has observed that, by enacting PECBA, first passed in 1973, “the legislature has provided a comprehensive statutory scheme authorizing and regulating collective bargaining between municipal and other public employers and employees, administered by ERB.” City of Roseburg v. Roseburg City Firefighters, 292 Or 266, 268, 639 P2d 90 (1981). This court noted that PECBA was designed to improve relations between public employers and their employees:
“* * * PECBA is intended to protect [public employees’] economic welfare during their employment and to provide a means for them to affect certain negotiable working conditions. Another policy served by PECBA is to protect public safety by the substantive device of prohibiting strikes of public safety employees. The substantive goal of that ban is prevention of interruption in the provision of essential government services. The class of persons to be benefited by this policy extends beyond the population of any city. PECBA is expressly premised upon a legislative determination that the people of the state have an interest in public employment relations at both the state and local levels of government.”
Id. at 276.
*816 Basically, in enacting PECBA, the legislature extended to public employees in Oregon the same benefits and protections that federal law had long afforded to employees in the private sector under the National Labor Relations Act (NLRA).[4] Congress enacted the NLRA, a sweeping piece of labor legislation, in 1935. The overarching purpose of the NLRA, also known as the Wagner Act, was to protect employees against employer interference with their organizational rights. See John E. Higgins ed., 1 The Developing Labor Law 29 (6th ed 2012) (“The prime function of the Act was to protect employees against employer tactics designed either to obstruct organizational efforts or to withhold the fruits of those efforts.”); see also Radio Officers’ Union of Commercial Telegraphers Union, A.F.L. v. NLRB, 347 US 17, 40, 74 S Ct 323, 98 L Ed 455 (1954) (“The policy of the Act is to insulate employees[5] jobs from their organizational rights.”). Senator Wagner, the sponsor of the bill, emphasized that purpose in his statements on the Senate floor. He argued that employees’ ability to join the labor organizations of their choosing, free from employer interference, had become a necessity in the modern industrial era: “Caught in the labyrinth of modern industrialism and dwarfed by the size of corporate enterprise, [the employee] can attain freedom and dignity only by cooperation with [other employees].” 79 Cong Rec 7565 (May 15,1935) (statement by Sen Wagner). He insisted that bill’s purpose was to ensure employees’ freedom of choice with regard to their organizational rights: “[The bill] does not force or even counsel any employee to join any union if he prefers to deal directly or indirectly with his employers. It seeks merely to make the worker a free man in the economic as well as the political field.” Id.
To accomplish its broad purpose of protecting against interference with labor rights, the NLRA conferred on employees a “triad of rights”: (1) the right to organize; (2) the right to bargain collectively; and (3) the right to engage in strikes, picketing, and other concerted activities. Higgins, The Developing Labor Law at 28. The NLRA *817 further assured the enjoyment of those rights by declaring it an unfair labor practice for an employer to, among other things, interfere with, restrain, or coerce employees in the exercise of their rights under the Act. 29 USC § 158(1).
In many respects, PECBA was patterned after the NLRA. See Elvin v. OPEU, 313 Or 165, 175, 832 P2d 36 (1992) (noting that PECBA was “modeled” after federal act); Donald W. Brodie, Public Sector Collective Bargaining in Oregon, 54 Or L Rev 337, 337-38 (1975) (same).[5] Similar to the protections that the NLRA provides for private employees, PECBA provides public employees the right to form and join labor organizations, ORS 243.662; requires good faith in collective bargaining, ORS 243.672(e); and prohibits unfair labor practices, ORS 243.672(c). See Carlton J. Snow, The Steelworkers Trilogy in Oregon’s Public Sector, 21 Willamette L Rev 445, 455 (1985) (identifying similar provisions in PECBA and NLRA). Indeed, PECBA and the NLRA define what constitutes an “unfair labor practice” in nearly identical ways. The NLRA provides, among other things, that it is an unfair labor practice for an employer:
“(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
“(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it[.]”
29 USC § 158(a). Likewise, under PECBA, it is an unfair labor practice for “a public employer or its designated representative” to, among other things:
*818 “(a) Interfere with, restrain or coerce employees in or because of the exercise of rights guaranteed in ORS 243.662.
“(b) Dominate, interfere with or assist in the formation, existence or administration of any employee organization.”
ORS 243.672(1).
In addition to their nearly identical provisions relating to unfair labor practices, PECBA and the NLRA both express policies of promoting collective bargaining and protecting employees’ organizational rights. The NLRA, for example, declares that it is the policy of the United States to reduce the causes of industrial strife by encouraging collective bargaining and protecting employees’ exercise of “full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection.” 29 USC § 151. Similarly, the 1973 Legislative Assembly declared it to be the policy of Oregon that “[t]he people of this state have a fundamental interest in the development of harmonious and cooperative relationships between government and its employees.” ORS 243.656(1). The Oregon legislature also declared that the purposes of PECBA are to “obligate public employers, public employees and their representatives to enter into collective negotiations with willingness to resolve grievances and disputes relating to employment relations” and to promote improved employer-employee relations “by providing a uniform basis for recognizing the right of public employees to join organizations of their own choice, and to be represented by such organizations in their employment relations with public employers.” ORS 243.656(5).
B. Whether Campbell’s Statements May Be Imputed to the City
Having briefly described the purposes of PECBA and its similarities to the NLRA, we now turn to the question on review: Was Campbell’s conduct that of a “public employer or its designated representative” within the meaning of PECBA when she submitted her letter to the newspaper encouraging city employees to decertify their union?
*819 The union argues that Campbell is a “public employer” by virtue other membership on the city’s governing body. The union also reprises the argument it made in the Court of Appeals that federal cases interpreting and applying the NLRA support its position that Campbell should be viewed as a “public employer” under PECBA. For its part, the city argues that, under its charter, members of the council are not authorized to act individually and that a majority vote of the council is required for the council to take official action. As a result, the city contends that an individual city councilor cannot be a “public employer” for purposes of PECBA. Further, the city argues that a city councilor is not a “designated representative” of the city, because city councilors are not specifically designated by the city to act in its interests in labor matters. Rather, under the city’s charter, only the city manager has the authority to hire, fire, or discipline any city employee.
We review ERB’s order holding the city liable for an unfair labor practice for legal error. ORS 183.482(8). To resolve this interpretive dispute as to whether Campbell acted as a “public employer or its designated representative” under ORS 243.672(1), we examine the text of the statute in context together with any relevant legislative history to determine legislative intent. State v. Gaines, 346 Or 160, 171-72, 206 P3d 1042 (2009).[6]
As noted, ORS 243.672(1) provides, in part:
“(1) It is an unfair labor practice for a public employer or its designated representative to do any of the following:
“(a) Interfere with, restrain or coerce employees in or because of the exercise of rights guaranteed in ORS 243.662.
“(b) Dominate, interfere with or assist in the formation, existence or administration of any employee organization.”
(Emphasis added.)
*820 1. “Public employer”
We begin by analyzing whether Campbell acted as a “public employer” within the meaning of ORS 243.672(1) when she wrote her letter. PECBA defines a “public employer” as
“the State of Oregon, and the following political subdivisions: Cities, counties, community colleges, school districts, special districts, mass transit districts, metropolitan service districts, public service corporations or municipal corporations and public and quasi-public corporations.”
ORS 243.650(20) (emphasis added). Thus, under the plain terms of the statute, the city in this case is a “public employer.”
As a corporate entity, a city can act in either of two ways. It can take official action in accordance with its governing documents, or it can act through its agents. In this case, we need not decide whether the term “public employer” extends to the city’s agents, because another provision of ORS 243.650 specifically prohibits at least some city agents from engaging in unfair labor practices. As noted, ORS 243.672(1) makes it an unfair labor practice for a public employer or its designated representative to engage in specified conduct. Subsection (21) of ORS 243.650 defines the term “public employer representative” as “includ[ing] any individual or individuals specifically designated by the public employer to act in its interests in all matters dealing with employee representation, collective bargaining and related issues.” Thus, if Campbell was acting as the city’s “designated representative” when she wrote her letter, the city may be held liable for her conduct.
2. “Designated representative”
Before determining whether Campbell was a “designated representative” of the city, we first address a somewhat curious discrepancy in the terminology that the legislature used to describe the individuals whom a public employer designates to act in its interests. As noted, ORS 243.672(1) prohibits a “public employer or its designated representative” from engaging in an unfair labor practice. The statute does not define what constitutes a “designated representative” of *821 a public employer, however. Instead, as discussed, the statute defines the similar term “public employer representative.” Ordinarily, we presume that different terms in a statute connote different meanings. See, e.g., State v. Connally, 339 Or 583, 591, 125 P3d 1254 (2005) (so stating). What makes the use of different terms in this case perplexing, however, is that the defined term “public employer representative” does not appear anywhere else in the statute. As a result, if we were to interpret a “public employer representative” under ORS 243.650(21) to mean something different than a “designated representative” of a public employer under ORS 243.672(1), then we would relegate the former term to mere surplusage — a result that this court seeks to avoid. See Crystal Communications, Inc. v. Dept. of Rev., 353 Or 300, 311, 297 P3d 1256 (2013) (“As a general rule, we construe a statute in a manner that gives effect, if possible, to all its provisions”).
Given the textual similarity between a “public employer representative,” which is defined as an individual whom a public employer designates to act in its interests, and a “designated representative [of a public employer],” we find it likely that the legislature intended those terms to be used interchangeably. Indeed, that is a more harmonious reading of the statute than one that would read ORS 243.650(21) out of PECBA. See ORS 174.010 (when construing statutes, court may not omit text that legislature inserted). We therefore construe a “public employer representative” and a “designated representative [of a public employer]” under PECBA to be synonymous. Accordingly, we use those terms interchangeably in this opinion.
We now consider whether Campbell acted as a “designated representative” of the city in writing her letter, such that the city may be held liable for her conduct under ORS 243.672(1). As noted, ORS 243.650(21) provides that a public employer representative “includes any individual or individuals specifically designated by the public employer to act in its interests in all matters dealing with employee representation, collective bargaining and related issues.” (Emphasis added.) The legislature’s use of the term “includes” indicates that a “public employer representative” is not limited to those individuals whom a public employer specifically *822 designates to act in its interests in all labor-related matters. See Haynes v. Tri-County Metro., 337 Or 659, 664-65, 103 P3d 101 (2004) (when legislature uses term “include,” definition is nonexclusive); Beaver v. Pelett, 299 Or 664, 668, 705 P2d 1149 (1985) (legislature’s use of verb “includes,” rather than “means,” indicates that definition is not exhaustive). Rather, the term “includes” suggests that a “public employer representative” also encompasses some broader category of individuals who act on behalf of a public employer.
Our task in determining whether Campbell is a “public employer representative,” therefore, is twofold. First, we must determine whether the city “specifically designated” her to act in its interests in “all” matters dealing with employee representation. Second, if not, we must determine which other individuals may constitute “public employer representatives” and whether Campbell was such an individual.
With regard to the first inquiry, the record does not show that the city “specifically designated” Campbell “to act in its interests in all matters dealing with employee representation, collective bargaining and related issues.” ORS 243.650(21). Nor does the union offer any evidence or argument to support such a proposition. We therefore conclude that Campbell was not the type of representative whom a public employer “specifically designates” to act in its interests in all labor matters.
Turning to the second inquiry, we must determine which other individual representatives of a public employer the legislature intended the term “public employer representative” to include. The dictionary defines a “representative” as “one that represents another as agent, deputy, substitute, or delegate usu. being invested with the authority of the principal.” Webster’s Third New Int’l Dictionary 1926-27 (unabridged ed 2002). Similarly, it defines the verb “represent” as
“to supply the place, perform the duties, exercise the rights, or receive the share of: take the place of in some respect : fill the place of for some purpose: substitute in some capacity for: act the part of, in the place of, or for (as another person) usu. by legal right.”
*823 Id. at 1926. Under its plain meaning, then, the term “representative” suggests some type of agency relationship between a public employer and its representative — that is, that a public employer representative is in some way authorized to act “in the place of, or for” the public employer. As discussed, however, the text of ORS 243.650(21) does not exhaustively define which individual agents might be considered a “representative” of a public employer.
Because ORS 243.650(21) does not exhaustively define a “public employer representative,” we look to the statutory context for guidance. One contextual clue is the legislature’s statement of policy. See US National Bank v. Boge, 311 Or 550, 560-61, 814 P2d 1082 (1991) (express purpose statement may be considered as context). As noted at the beginning of this analysis, the legislature included a policy statement in PECBA, generally modeled after the policies articulated in the NLRA, expressly finding and declaring that the people of Oregon “have a fundamental interest in the development of harmonious and cooperative relationships between government and its employees.” ORS 243.656(1). To that end, the legislature stated that “[Recognition by public employers of the right of public employees to organize and full acceptance of the principle and procedure of collective negotiation between public employers and public employee organizations can alleviate various forms of strife and unrest.” ORS 243.656(2). The legislature further recognized that “protection by law of the right of employees to organize and negotiate collectively safeguards employees and the public from injury, impairment and interruptions of necessary services.” ORS 243.656(3). Ultimately, the legislature stated that the purpose of PECBA was to “promote the improvement of employer-employee relations within the various public employers by providing a uniform basis for recognizing the right of public employees to join organizations of their own choice, and to be represented by such organizations in their employment relations with public employers.” ORS 243.656(5). The legislature’s statement of policy thus demonstrates an intent for PECBA to apply broadly in favor of public employees’ rights to organize and bargain collectively.
*824 That intent is borne out by other provisions of PECBA as well. See Force v. Dept. of Rev., 350 Or 179, 188, 252 P3d 306 (2011) (“‘[C] ontext’ includes, among other things, other parts of the statute at issue.”). For example, PECBA expressly provides that “ [p]ublic employees have the right to form, join and participate in the activities of labor organizations of their own choosing.” ORS 243.662. That right is protected by ORS 243.672 — the provision at issue in this case — which imposes liability for various unfair labor practices. As relevant to this case, a public employer or its designated representative commits an unfair labor practice if the employer or representative “interfere[s] with, restraints] or coerce [s] employees in or because of the exercise of rights guaranteed in ORS 243.662.” ORS 243.672(l)(a). Read together, those provisions further demonstrate the legislature’s intent for PECBA to broadly protect public employees against employer interference with their organizational and bargaining rights.
The statutory context thus indicates that the term “public employer representative” should be construed broadly. Neither the text of ORS 243.650(21) nor other, related provisions of PECBA, however, conclusively identify which individual agents of a public employer are “include [d] ” within the definition of a “public employer representative.” We therefore seek guidance on that point from relevant federal case law that has developed under the NLRA. Specifically, we consider federal cases interpreting the NLRA that were in existence at the time that the legislature enacted PECBA. Those cases, although not binding on this court, provide persuasive authority for this court’s interpretation of PECBA, because, as noted, the legislature largely modeled Oregon’s statute after the federal one. Elvin, 313 Or at 177 (“Because *** PECBA was adopted to model the NLRA, we look to cases decided under the NLRA, and particularly to cases decided prior to 1973 — the year in which PECBA was adopted — to obtain guidance in interpreting PECBA.”).[7]
*825 As early as 1974 — shortly after PECBA was enacted — the Oregon Court of Appeals acknowledged the similarities between the state and federal statutes, and concluded that federal case law interpreting the NLRA could provide guidance in interpreting related provisions of PECBA. See Klamath County v. Laborers Int’l Union, Local 915, 21 Or App 281, 288, 534 P2d 1169 (1975) (“[T]he similarity between parts of the two statutes indicates that federal decisions interpreting the NLRA be given some weight in interpreting similar sections of the Oregon statute.”). Since that time, Oregon appellate courts have continued to consider federal case law for its persuasive value in interpreting PECBA. See, e.g., Elvin, 313 Or at 179 (“[W]e interpret PECBA by looking to how the NLRA was interpreted before 1973 [.]”); Assn. of Oregon Corrections Emp. v. State of Oregon, 267 Or App 413, 418, 343 P3d 637 (2014) (because PECBA was modeled after NLRA, “federal case law provides guidance in interpretation of PECBA”); Portland Assn. Teachers v. Mult. Sch. Dist. No. 1, 171 Or App 616, 631 n 6, 16 P3d 1189 (2000) (because PECBA adopted to model NLRA, court looked to “cases decided under the federal act — and particularly to cases decided before 1973, the year in which PECBA was adopted — for guidance in interpreting PECBA”). We once again seek guidance from federal *826 law in this case in an effort to discern the meaning that the legislature intended to ascribe to the term “public employer representative.”[8]
Federal courts interpreting the NLRA have often been confronted with the question of which individual agents’ conduct may be imputed to an employer for purposes of unfair-labor-practice liability. As with a public employer, an employer in the private sector is capable of acting only through its individual officers and agents. See, e.g., Corporations, 18B Am Jur 2d § 1139 at 182 (2015) (“A corporation can act only through the authorized acts of its corporate directors, officers, and other employees and agents.”); 1 Corporations, 8 CJS § 7 at 314 (2007) (“A corporation can only act through natural persons who are in charge of its affairs.”). The NLRA takes that reality into account by defining an “employer” to include the individuals through whom a company acts. As originally enacted, the NLRA defined an “employer” to include “any person acting in the interest of an employer, directly or indirectly.” National Labor Relations Act, ch 372, § 2, 49 Stat 450 (1935). As we will discuss, Congress later amended that definition to include “any person acting as an agent of an employer, directly or indirectly.” 29 USC § 152(2) (emphasis added). Under either version, however, federal courts have determined an employer’s liability for an individual agent’s unfair labor practice by considering the nature of the individual’s position within the company and whether other employees would reasonably *827 perceive that individual to have been authorized to speak for the employer.
With regard to the conduct of individuals at the highest levels of authority, federal courts generally have assumed, without explicit analysis, that an employer may be held responsible. In particular, federal courts have held that an employer is responsible for the conduct of its executive officers — i.e., officers who have the authority to determine the company’s general business and labor policies. E. H. Schopflocher, Annotation, Unfair Labor Practice, within National Labor Relations Act or Similar State Statute, Predicated upon Statements or Acts by Employees Not Expressly Authorized by Employer, 146 ALR 1062 (1943). Indeed, courts have treated the proposition that an executive officer may bind the company as so obvious as to not warrant discussion. See, e.g., Morgan Precision Parts v. NLRB, 444 F2d 1210, 1215 (5th Cir 1971) (company responsible for company owner’s anti-union activity); Madison Brass Works, Inc. v. NLRB, 381 F2d 854, 857 (7th Cir 1967) (company president’s remarks threatening economic reprisal if employees unionized constituted unfair labor practice); NLRB v. John & Ollier Engraving Co., 123 F2d 589, 593 (7th Cir 1941) (employer responsible for unfair labor practices of “executive officers”); NLRB v. Lightner Pub. Corp. of Illinois, 113 F2d 621, 625 (7th Cir 1940) (holding corporate employer liable for unfair labor practice committed by corporation’s president where president wrote letters to men on strike indicating that he would not negotiate with representatives of employees); NLRB v. Ed. Friedrich, Inc., 116 F2d 888, 890 (5th Cir 1940) (holding that, to establish company domination or support of unaffiliated union, it was not necessary to prove express acts by stockholders or executive officers of company — thereby implying that, as matter of course, company was responsible for acts of those persons).
The more challenging question for federal courts has been whether an employer may be held responsible for the actions of individuals who hold a position of authority that is less than an executive officer but greater than a rank-and-file employee. Such an employee generally occupies *828 some type of supervisory position, but is not entrusted with the duty to determine the employer’s general business and labor policies. Shortly after the NLRA was enacted, the United States Supreme Court addressed the question of an employer’s responsibility for the unfair labor practices of such individuals in two cases: International Association of Machinists, Tool and Die Makers Lodge No. 35 v. Labor Board, 311 US 72, 61 S Ct 83, 85 L Ed 50 (1940), and H. J. Heinz Co. v. NLRB, 311 US 514, 61 S Ct 320, 85 L Ed 309 (1941).
In International Association of Machinists, the Court upheld a determination by the National Labor Relations Board (NLRB) that an employer was responsible for the organizational efforts of several low-level employees, despite the fact that the employer had not expressly authorized or ratified the employees’ actions. Rejecting the notion that strict principles of agency law applied when determining employer responsibility under the NLRA, the Court concluded that an employer could be held responsible for the actions of its “so-called agents” even though those acts “were not expressly authorized or might not be attributable to [the employer] on strict application of the rules of respondeat superior” Id. at 80. The Court explained:
“We are dealing here not with private rights * * * nor with technical concepts pertinent to an employer’s legal responsibility to third persons for acts of his servants, but with a clear legislative policy to free the collective bargaining process from all taint of an employer’s compulsion, domination, or influence. The existence of that interference must be determined by careful scrutiny of all the factors, often subtle, which restrain the employees’ choice and for which the employer may fairly be said to be responsible.”
Id. Ultimately, the Court announced the following rule for determining when an employer “may fairly be said to be responsible” for an agent’s unfair labor practice: “[W]here the employees would have just cause to believe that [the agents] were acting for and on behalf of the management, the Board would be justified in concluding that they did not have the complete and unhampered freedom of choice which the Act contemplates.” Id.
*829 In Heinz, the Court addressed a similar claim by an employer that it could not be held responsible for the unfair labor practices of several supervisors, because the employer had not authorized or ratified those employees’ conduct. Again, the Court held that the supervisors’ conduct was chargeable to the employer, reiterating that the question of employer liability under the NLRA did not hinge on strict principles of agency or respondeat superior:
“The question is not one of legal liability of the employer in damages or for penalties on principles of agency or respon-deat superior, but only whether the Act condemns such activities as unfair labor practices so far as the employer may gain from them any advantage in the bargaining process of a kind which the Act proscribes.”
311 US at 521.
After the Supreme Court decided International Association of Machinists and Heinz, Congress enacted the Labor Management Relations Act of 1947, also known as the Taft-Hartley Act. Labor Management Relation Act of 1647, ch 120, 61 stat 136 (1947). That Act amended various provisions of the NLRA, including the definition of an “employer.” The Taft-Hartley amendments changed the definition to its current text: “any person acting as an agent of an employer, directly or indirectly.” 29 USC § 152(2). Despite the narrowing of the definition of an employer from any “person” acting in the interest of an employer to any person acting as an “agent” of an employer, however, federal courts have repeatedly affirmed the liberal principles of employer responsibility originally announced in International Association of Machinists and Heinz. See, e.g., Ingress-Plastene, Inc. v. NLRB, 430 F2d 542, 545 n 3 (7th Cir 1970) (whether person who committed unfair labor practice was supervisor “is irrelevant so long as she gave the appearance of acting on behalf of management”; citing International Association of Machinists)', Amalgamated Clothing Workers of America, AFL-CIO v. NLRB, 371 F2d 740, 744 (DC Cir 1966) (employer responsibility under NLRA “is not controlled by refinements of the law of agency”); NLRB v. Houston Chronicle Pub. Co., 300 F2d 273, 280 (5th Cir 1962) (because supervisor was in position to give his subordinates cause to believe that he *830 was acting for management, his unfair labor practice was attributable to employer; citing International Association of Machinists and Heinz)', NLRB v. Hart Cotton Mills, 190 F2d 964, 974 (4th Cir 1951) (employer responsibility for acts of supervisory employees “is not determined by applying principles of agency or respondeat superior but by ascertaining whether the conduct or activity is condemned by the Act”; citing Heinz) .[9]
Thus, even after the Taft-Hartley amendments, federal courts have continued to determine employer responsibility for unauthorized actions of an individual by analyzing whether employees would reasonably believe that the individual was acting for and on behalf of the employer. See, e.g., American Door Co., Inc., 181 NLRB 37, 43 (1970) (crucial question in determining whether employer is responsible for acts of “so called agents” is whether, considering all circumstances, “the employees could reasonably believe that [the purported agent] was reflecting company policy, and speaking and acting for management”) (citing NLRB v. Des Moines Food, Inc., 296 F2d 285, 287 (8th Cir 1961)); Irving Air Chute Co. v. NLRB, 350 F2d 176, 179 (2d Cir 1965) (broad rule under NLRA places responsibility on employer for acts of supervisor when employees “would have just cause to believe” that supervisor was acting for and on behalf of company); NLRB v. Geigy Co., 211 F2d 553, 557 (9th Cir 1954) (whether statements of foreman were attributable to employer depended on whether employees “might reasonably have believed” that, in making them, foreman was acting for and on behalf of management).
In applying that “reasonable belief’ standard, federal courts have considered “all factors, often subtle, which *831 restrain the employees’ choice and for which the employer may fairly be said to be responsible.” International Association of Machinists, 311 US at 80. “It is unnecessary that all factors be present in each case, for one or more may be sufficient to authorize the inference [that the individual acted on behalf of the employer.]” NLRB v. Pacific Gas & Electric Co., 118 F2d 780, 787-88 (9th Cir 1941). Among other factors, courts have considered whether the individual acting on behalf of the employer occupied a high-ranking position within the company hierarchy, whether the individual’s responsibilities put him or her in a position to be identified with management in the eyes of employees, whether the individual set management policy, whether the individual was in a strategic position to translate the policies and desires of management to other employees, whether the individual had the power to hire and fire employees, and whether the employer disavowed the actions of the individual. See, e.g., International Association of Machinists, 311 US at 80-81 (considering individuals’ position in factory hierarchy, their power to hire or fire, and whether they exercised “general authority over the employees and were in a strategic position to translate to their subordinates the policies and desires of the management”); Amalgamated Clothing Workers of America, 371 F2d at 744 (considering employer’s “lack of disavowal” of individual’s actions); McKinnon Services, Inc., 174 NLRB 1141, 1144 (1969) (whether or not individual was technically considered “supervisor” under NLRA, “her responsibilities put her in a position to be identified with management in the eyes of the employees and to translate to them the policies and desires of management”).
Having summarized the relevant federal case law, we now consider what guidance, if any, that case law provides in determining the limits of a public employer’s liability under PECBA for the unfair labor practices of its “designated representative.” We note, initially, that the two statutes define an employer somewhat differently. That is understandable, given that one statute defines an employer in the public sector and the other defines an employer in the private sector. Despite that difference, however, the acts are otherwise remarkably similar. PECBA and the NLRA are driven by the same policy of preventing employer *832 interference with employees’ organizational and bargaining rights. Both statutes protect those rights by proscribing unfair labor practices, and both statutes define an “unfair labor practice” in virtually identical terms. Compare, e.g., ORS 243.672(1)(a) (unfair labor practice for public employer or its designated representative to “[interfere with, restrain or coerce employees in or because of the exercise of rights guaranteed in ORS 243.662”), with 29 USC § 158(a) (unfair labor practice for employer to “interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title”). Further, in identifying an employer’s responsibility for an unfair labor practice, both statutes provide that an employer may be held liable for the conduct of the formal entity constituting the “employer,” as well as for the conduct of at least some individual agents who act on that entity’s behalf. Given the statutes’ similarities in both text and purpose, we conclude that the legislature intended the provisions of PECBA at issue in this case to be interpreted in line with the preexisting case law under the NLRA. In addition, we conclude that the “reasonable belief” standard that federal courts have adopted in interpreting the NLRA is a well-reasoned one, and one that best effectuates the legislature’s policy goal of protecting employees’ organizational rights from employer interference.
For those reasons, we adopt the “reasonable belief’ standard under PECBA for determining which individuals constitute a “public employer representative,” such that a public employer may be held responsible for the unfair labor practices committed by such individuals. Specifically, when employees of a public employer would reasonably believe that a given individual acted on behalf of the public employer in committing an unfair labor practice, that individual is a “public employer representative” under ORS 243.650(21), and the public employer may be held liable for the conduct of that individual under ORS 243.672(1).
In applying the “reasonable belief’ standard, adjudicators should consider “all factors, often subtle, which restrain the employees’ choice and for which the employer may fairly be said to be responsible.” International Association of Machinists, 311 US at 80. One key factor will be whether the individual acting on behalf of the public entity occupied *833 a high-ranking position within the public entity. As the federal courts have recognized, the potential for interference with employees’ labor rights is greatest at the highest levels of authority. Moreover, the greater an individual’s general policy-making authority, the more likely that employees would reasonably believe that that individual acted on behalf of the entity. Other relevant factors include whether the individual acted in his or her official capacity when he or she committed the unfair labor practice, whether the individual had the power to hire and fire employees of the public entity, and whether the public entity disavowed the actions of the individual. One or more of those factors may be sufficient to authorize the inference that the individual acted on behalf of the public entity and that the entity is therefore liable for the individual’s actions. Pacific Gas & Electric Co., 118 F2d at 787-88.
In adopting the “reasonable belief’ standard, we reject the argument of the city and dissent that the statements of an individual city councilor cannot be imputed to the city. They argue, however, that an action by a city council member without the concurrence of a majority of the council has no legal effect and that, therefore, the city cannot be liable for the unfair labor practices of an individual council member. The dissent argues that the acts of individuals generally do not bind public entities. 360 Or at 840 (Landau, J., dissenting). However, this case does not involve the scope of municipal liability under general principles of tort and contract law. Rather, this case involves the scope of liability for a public employer for unfair labor practices under the specific statutory framework of PECBA.
Moreover, under the view of the city and dissent, voting members of a public employer would be allowed to violate PECBA with impunity. Indeed, multiple members of a voting body could interfere with protected union activity as long as less than a majority of the body acted. That circumstance would contravene the legislature’s express declaration that “[t]he people of this state have a fundamental interest in the development of harmonious and cooperative relationships between government and its employees.” ORS 243.656(1). It would also be at odds with the legislative recognition that public employees “have the right to form, join *834 and participate in the activities of labor organizations of their own choosing,” as stated in ORS 243.662. Indeed, the city’s narrow interpretation — which would require a majority of the council to commit a violation — does not capture the many ways in which voting members of the council, acting on behalf of the city, might “[interfere with, restrain or coerce employees in or because of the exercise of rights guaranteed” in PECBA. ORS 243.672(1). Such an interpretation would therefore undermine the legislature’s intention that PECBA broadly protect public employees’ rights against employer interference.[10]
We now apply the rule that we announce today to the facts of this case. The ERB did not address whether Campbell was a “designated representative” of the city within the meaning of ORS 243.672(1), such that the city nevertheless may be held liable for her conduct. We therefore remand to ERB to make that determination in the first instance. ORS 183.482(8). On remand, ERB must determine whether city employees would reasonably believe that Campbell was acting on behalf of the city when she wrote her letter urging city employees to decertify the union. In making that determination, ERB should consider all relevant factors, including, but not limited to, whether Campbell occupied a high-ranking position within the city, whether Campbell *835 had general policy-making authority for the city, whether Campbell had the authority to hire and fire city employees, whether Campbell acted within her official capacity as a city councilor when she made her statements, and whether the city disavowed Campbell’s statements.
Because we conclude that Campbell may have been a “designated representative” of the city, depending on whether city employees would have reasonably believed that she acted on behalf of the city in urging those employees to decertify the union, we reverse the Court of Appeals decision that Campbell could not be a “designated representative” under PECBA.
The decision of the Court of Appeals is reversed. The case is remanded to the Employment Relations Board for further proceedings.

 Specifically, the board concluded that the city had violated ORS 243.672(l)(a) and (b), which provide:
“It is an unfair labor practice for a public employer or its designated representative to do any of the following:
“(a) Interfere with, restrain or coerce employees in or because of the exercise of rights guaranteed in ORS 243.662.
“(b) Dominate, interfere with or assist in the formation, existence or administration of any employee organization.”

 The board relied on its prior decision in OPEU v. Jefferson County, 18 PECBR 310 (1999), in which a county commissioner unlawfully refused to directly bargain with a union because bargaining unit members picketed his personal business. The commissioner told the president of the union that “he wanted to get rid of [the union]” and that he did not want to talk with the union’s staff members. ERB concluded that the commissioner’s statements interfered with the administration and existence of the union:
“Ahern’s comments, directed to OPEU’s local president and almost certain to be relayed to other members of the bargaining unit, strike at the core of the relationship between the employees and OPEU. When one of the three main decision-makers for the County says he wants the employees to get rid of OPEU and not let OPEU staff members participate in bargaining, that directly impacts OPEU by undermining bargaining unit members’ confidence in OPEU as exclusive representative.”
Id. at 318 (footnote omitted).

 The city did not assign error to ERB’s conclusions that Campbell’s conduct otherwise amounted to an unfair labor practice or that holding the city liable for her comments did not violate the free speech guarantees of Article I, section 8, of the Oregon Constitution.

 The NLRA applies only to private sector employment and expressly excludes public entities from the definition of “employer.” See 29 USC § 152(2) (noting that an “employer” under the NLRA “shall not include the United States or * * * any State or political subdivision thereof”).

 The legislative history of PECBA makes little mention of the NLRA. That history indicates, however, that the legislature drew from other states’ public sector bargaining acts, which — in turn — had been modeled after the federal act. See, e.g., Tape Recording, Senate Committee on Labor, HB 2263, May 31, 1973, Tape 19, Side 2 (statement of Jim Redden, chairman of Governor’s Task Force on Collective Bargaining in the Public Sector) (noting that PECBA was based on public bargaining statutes in other states — namely, New York, Hawaii, and California); Marcus R. Widenor, Public Sector Bargaining in Oregon: The Enactment of the PECBA, University of Oregon, LERC Monograph Series No. 8 (1989) (other states’ bargaining laws in existence at time of PECBA’s enactment “drew on the model for labor-management relations outlined for private sector workers in the National Labor Relations Act”).

 We do not give deference to ERB’s interpretation of “public employer” under the statute, because such deference is not given when a term is inexact. Blachana, LLC v. Bureau of Labor and Industries, 354 Or 676, 687, 318 P3d 735 (2014) (description of “exact,” “inexact,” and “delegative” terms for purposes of determining deference to agency when disputed statutory term is part of regulatory scheme). The term “public employer” is an inexact term, because it is imprecise, requiring further interpretation. Id.

 The dissent argues that there is “no textual connection” between the PECBA and the NLRA that would provide a basis for concluding that the Oregon legislature intended the PECBA to incorporate the federal case law that existed under the NLRA. 360 Or at 842 (Landau, J., dissenting). We disagree. Both the state and federal statutes prohibit an “employer” from committing an unfair labor practice. And both statutes provide that it is an unfair labor practice for an *825 employer to “interfere with, restrain or coerce employees” in the exercise of their organizational rights. ORS 243.672(1); 29 USC § 158(a)(1). Based on that textual connection — as well as the shared purpose of the two statutes — we conclude that the relevant federal case law in existence at the time of PECBA’s enactment provides persuasive authority when interpreting the unfair-labor-practice provisions of PECBA. See State v. Kennedy, 295 Or 260, 267, 666 P2d 1316 (1983) (recognizing that this court may rely on federal case law in interpreting provision of Oregon law, not because we are bound to do so, but because we find that case law persuasive). This court has often looked to relevant federal case law for its persuasive value in interpreting an Oregon statute when that statute was modeled after a federal statute. See, e.g., Redmond Ready-Mix, Inc. v. Coats, 283 Or 101, 110, 582 P2d 1340 (1978) (when Oregon’s Anti-Price Discrimination Law modeled after federal acts, “federal cases interpreting the federal statutes are persuasive to us in interpreting the Oregon statute”); Karsun v. Kelley, 258 Or 155, 161, 482 P2d 533 (1971) (when Oregon’s Blue Sky Law amended “to adopt substantially the same terms as set forth in the Federal Security Act[,] * ** the legislative history of that act, as well as decisions construing its provisions, are of significant interest”). Indeed, this court has found federal law persuasive even when two comparable statutes are not identical. See State v. Walker, 356 Or 4, 23 n 9, 333 P3d 316 (2014) (looking to federal RICO statute, upon which Oregon’s RICO statute was modeled, even though Oregon provision had been “modified somewhat”; noting that Oregon’s provision was “not *** inconsistent” with federal one).

 The dissent acknowledges that the definition of “public employer representative” leaves open “the possibility that others not specifically designated [in the definition] may also be included” but argues that that definition “reflects an obvious parallel to common-law principles of agency with which we presume the legislature was familiar,” citing State v. Ramos, 358 Or 581, 368 P3d 446 (2016). 360 Or at 839 (Landau, J., dissenting). In Ramos, this court concluded that “reasonable foreseeability” is a limiting concept that applies to an award of economic damages under ORS 137.106, a statute requiring that a defendant pay restitution equal to the full amount of a victim’s economic damages resulting from the defendant’s crime. Id. at 596. Because the legislature “adopted the definition of ‘economic damages’ that applies in civil actions,” the court concluded, “it [is] likely that the legislature intended to apply the traditional civil law concept of reasonable foreseeability to determine whether claimed damages are ‘too remote,’ rather than intending that some other test of‘remoteness’ apply.” Id. at 596-97. We do not agree that the legislature — by using the term “representative” — has clearly adopted common-law principles of agency when “representative” is not a common-law concept. See also State v. Stark, 354 Or 1, 10, 307 P3d 418 (2013) (court presumes legislature is aware of existing law).

 That is so despite legislative history indicating an intent for the new definition of employer to incorporate traditional agency principles. See, e.g., NLRB v. International Longshoremen’s and W'arehousemen’s Union Local 10, 283 F2d 558, 563 (9th Cir 1960) (noting that “Senator Taft, the life-force behind the bill as enacted, repeatedly remarked on the floor of the Senate that common law rules of agency were to govern the question of who acted for whom for purposes of determining culpability under the Act”). Indeed, some federal decisions have applied strict principles of agency law when determining employer liability under the NLRA. For the reasons that we explain, however, we find those federal cases that have applied the broader “reasonable belief” standard to be more consistent with the statutory purpose of protecting employees’ labor rights and, therefore, more persuasive.

 Relatedly, the dissent argues that NLRA decisions imposing liability on private employers for the acts of executive or management personnel have no application to the Lebanon City Council because employees in the private sector have individual authority to act and city council members do not. 360 Or 848 (Landau, J., dissenting). We agree that the comparison of a public body to executive officers in a private company is not a perfect fit. However, as we have discussed, the provisions of PECBA evidence an intention by the legislature that public employees in Oregon receive the same benefits and protections that the NLRA provide to employees in the private sector. We emphasize that the rule we adopt today is not based solely on the authority of an individual member of a public body to act. The rationale for the rule is based instead on whether the conduct of an individual is such that an employer may gain an advantage from an individual’s interference with union organizing or the collective bargaining process. See NLRB v. Hart Cotton Mills, 190 F2d at 974 (employer responsibility for acts of individuals “is not determined by applying principles of agency or respondeat superior but by ascertaining whether the conduct is condemned by the Act”; citing Heinz). Thus, as we have explained, although the authority of Campbell to act on behalf of the city may — in various ways — be considered as a relevant factor in applying the “subjective belief” test, her individual authority does not, as a matter of law, determine whether the city may be held liable for her conduct.