Argued and submitted December 18, 2020, affirmed August 4, 2021

Thaddeus R. GALA, DC,
*Petitioner,*

*v.*

BOARD OF CHIROPRACTIC EXAMINERS,
*Respondent.*

Board of Chiropractic Examiners
20151001, 20153005, 20161007;
A169311

496 P3d 1122

Petitioner seeks judicial review of a final order of the Oregon Chiropractic Board of Examiners (the board), which imposed a disciplinary sanction on petitioner for unprofessional or dishonorable conduct and gross negligence. On review, petitioner challenges the board's determinations, contending that they are legally erroneous and unsupported by substantial evidence. *Held*: The determinations made by the board and challenged by petitioner on judicial review are not legally erroneous and are supported by substantial evidence.

Affirmed.

James R. Dole argued the cause for petitioner. Also on the briefs was Watkinson Laird Rubenstein, P.C.

Jona J. Maukonen, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum Attorney General, and Benjamin Gutman, Solicitor General.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Aoyagi, Judge.

TOOKEY, J.

Affirmed.

**TOOKEY, J.**

Petitioner, a chiropractic physician, seeks judicial review of a final order of the Oregon Chiropractic Board of Examiners (the board). The final order imposed a disciplinary sanction on petitioner for unprofessional or dishonorable conduct and gross negligence in providing care to three patients—Patients 1, 2, and 3—through his "Healthy Living Plan" wellness program (HLP).

We write to address petitioner's first through fourth assignments of error, in which petitioner challenges the board's determinations that (1) petitioner's HLP is subject to the chiropractic standard of care; (2) petitioner engaged in unprofessional or dishonorable conduct; (3) petitioner engaged in gross negligence; and (4) petitioner could be disciplined for conduct relating to Patient 3, who did not consider herself petitioner's patient. We reject petitioner's remaining assignment of error without discussion,[1] and for the reasons that follow, we affirm.

## I.   STANDARD OF REVIEW

We review the board's order for errors of law and substantial evidence. ORS 684.105(2); ORS 183.482(8)(a), (c); *Bruntz-Ferguson v. Liberty Mutual Ins.*, 310 Or App 618, 619, 485 P3d 903 (2021). Substantial evidence "exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding." ORS 183.482(8)(c). In addition to reviewing for substantial evidence, "we also review the board's order for substantial reason." *Bruntz-Ferguson*, 310 Or App at 619. Substantial reason exists when "the board provided a rational explanation of how its factual findings lead to the legal conclusions on which the order is based." *Id.* In conducting our review, "the court shall not substitute its judgment for that of the agency as to any issue of fact." ORS 183.482(7).[2]

---

[1] In his fifth assignment of error, petitioner contends that the board's final order "improperly infringes on his [commercial speech] rights under Article I, § 8 of the Oregon Constitution," because "[t]he only basis for the board to seek discipline is because [petitioner] refers in advertising and media to the fact that he is an Oregon licensed chiropractor."

[2] Although reviewing for substantial evidence includes reviewing for substantial reason, *see, e.g.*, *Jenkins v. Board of Parole*, 356 Or 186, 201, 335 P3d 828

## II.　FACTUAL BACKGROUND

We begin by briefly summarizing the facts giving rise to this case, which we later supplement with additional facts in our discussion of each assigned error.

Petitioner is a licensed chiropractic physician. He runs a traditional chiropractic business and a second business called "My Diabetic Solution." According to petitioner's website, "My Diabetic Solution was created with the sole purpose and goal of helping 5 million people achieve their individual health goals *** [and to] help people with all types of diabetes and chronic ailments reverse their disease in 1-8 months." Through My Diabetic Solution, petitioner offers four free seminars, each focused on a specific medical condition: diabetes, fibromyalgia, sleep apnea, and neuropathy. The seminars are open to the public and advertised in print and online. Those advertisements always note petitioner's status as a chiropractic physician.

At the seminars, attendees may register for an individual consultation with petitioner. In so doing, an attendee completes a "Health Application and Case History" form, in which the attendee identifies, among other things, current and past health problems and medications. During the consultation, petitioner explains the HLP wellness program and determines whether the attendee is suitable to participate in the HLP, which focuses on introducing an anti-inflammatory diet, lifestyle changes, dietary supplements, and exercise. Petitioner offers two-, four-, and six-month HLP plans, charging flat fees of $2,495, $5,995, and $6,995, respectively.

Once accepted into the HLP, participants can communicate directly with petitioner, but they do not receive one-on-one care from petitioner; instead, they receive one-on-one services through scheduled phone calls with HLP "health coaches." Coaching calls usually occur once a week and focus on the HLP participants' goals, progress, and challenges. Health coaches provide information and advice

(2014) ("[T]he substantial reason requirement is part of the substantial evidence standard of review."), petitioner's briefing is largely focused on substantial evidence and arguments that the board's decision is "contrary to law"; consequently, our analysis is similarly focused.

to the participants about how to implement the HLP, including advice on meal preparation, unhealthy eating habits, and dietary supplements.

Before coaching HLP participants, new health coaches are required to complete a seven-week training course developed by petitioner, but those health coaches are not licensed or certified by any Oregon agencies. Health coaches are overseen by the My Diabetic Solutions wellness director, who is in turn supervised by petitioner. Petitioner meets with the health coaches once a month, and he is available to answer questions from the health coaches or their HLP participants.

In 2015 and 2016, the board received complaints regarding three HLP participants—*i.e.*, Patients 1, 2, and 3—and their interactions with petitioner and his HLP.

Patient 1 was 79 years old, had dementia, and enrolled in the HLP after attending petitioner's fibromyalgia seminar. She indicated in her Health Application that her main problems included fibromyalgia and neuropathy. She discontinued her participation in the HLP after about a month on the advice of her primary care provider and her daughter and received a partial refund. The complaint regarding Patient 1 was submitted to the board by her daughter.

Patient 2 was 82 years old, had dementia, and enrolled in the HLP after attending petitioner's neuropathy seminar. She indicated in her Health Application that she had numerous medical conditions, including conditions of the heart, lungs, spine, and nervous system. She stopped participating in the HLP after several weeks and received a full refund. The complaint regarding Patient 2 was submitted to the board by a physician's assistant in the office of her primary care provider.

Patient 3 was 69 years old and enrolled in the HLP after attending petitioner's fibromyalgia seminar. During her 30-minute consultation with petitioner, she became "very nervous and scared" and enrolled in the HLP because "she felt pressured to do so." Shortly after leaving the consultation, she informed one of petitioner's assistants that

she did not want to participate in the HLP, and she eventually received a full refund. The complaint regarding Patient 3 was submitted to the board by Patient 3 herself.

The complaints relating to Patients 1, 2, and 3 ultimately led to the board issuing the final order that we are now asked to review. In that order, the board determined, among other things, that (1) petitioner's HLP was subject to the chiropractic standard of care; (2) petitioner had engaged in unprofessional or dishonorable conduct; (3) petitioner had engaged in gross negligence; and (4) petitioner had a doctor-patient relationship with Patients 1, 2, and 3. On review, petitioner challenges each of those determinations, and we address each, in turn.

## III.   ANALYSIS

A.   *First Assignment of Error: HLP and the Chiropractic Standard of Care*

In his first assignment of error, petitioner contends that "[t]he final order is contrary to law and is not based on substantial evidence, because [petitioner's] program of wellness care is not 'chiropractic' and is therefore not subject to the standard of care for traditional chiropractic care." We disagree.

The board determined that the HLP was "chiropractic" and subject to the chiropractic standard of care. That determination was based largely on the expert testimony of four chiropractors who testified at petitioner's hearing:

> "[W]hen recommended solely as a means to maintain and maximize health, the wellness care plan would not be considered chiropractic practice. However, *as opined by all the chiropractors* with the exception of [petitioner], *when wellness care is recommended for a specific medical condition, then it is considered chiropractic practice and offered as a treatment plan for that condition.*"

(Emphases added.) Additionally, the board noted that petitioner "agreed that, for a patient seeking problem-based care, the chiropractor would need to follow all the requirements of traditional chiropractic care." In light of the experts' testimony, the board concluded that "the standard is clear— if the chiropractor is providing problem-based care to a

patient, then [they] must follow the traditional chiropractic standards, regardless of the nature of the recommended treatment."

The board then reviewed "the totality of the circumstances" to "determine[] whether the HLP is offered as a treatment plan for a specific medical condition." In so doing, the board highlighted (1) petitioner's HLP advertisements "targeting patients who experience very specific medical conditions"—*i.e.*, "diabetes, fibromyalgia, and neuropathy"; (2) petitioner's website and HLP materials asserting that "medications are not the answer to treating certain medical conditions," and that the HLP "is the road map to reversing chronic disease"; and (3) petitioner's recommendation of "the HLP to the three patients as a treatment program for their specific medical conditions, fibromyalgia in the cases of Patients 1 and 3, and neuropathy in the case of Patient 2."

Based on those circumstances, the board—like the administrative law judge—found "the evidence overwhelming that [petitioner] provides problem-based care to the HLP participants," and it reasoned that "[b]ecause [petitioner] proposed the HLP to Patients 1, 2, and 3 as a treatment for their specific medical conditions, he was required to fulfill all standards of chiropractic care during his interactions with each of the three patients."

We conclude that the board's determination that petitioner must meet the chiropractic standard of care in providing the HLP to the participants is not legally erroneous and is supported by substantial evidence.

B.  *Second Assignment of Error: Unprofessional or Dishonorable Conduct*

Next, petitioner assigns error to the board's various determinations that he engaged in unprofessional or dishonorable conduct, arguing that the standards applied by the board are "improperly vague" and that substantial evidence does not support the board's findings. We disagree.

Under ORS 684.100(1)(f)(A), the board may discipline a person based on unprofessional or dishonorable conduct, including but not limited to,

"[a]ny conduct or practice contrary to recognized standard of ethics of the chiropractic profession or any conduct or practice that does or might constitute a danger to the health or safety of a patient or the public or any conduct, practice or condition that does or might adversely affect a physician's ability safely and skillfully to practice chiropractic."

Here, the board determined that petitioner engaged in unprofessional or dishonorable conduct because he "violated the standards of chiropractic care" in six ways: (1) failing to carefully review the patients' medical and health information; (2) failing to perform an appropriate examination of each patient; (3) failing to render his own diagnosis for each patient; (4) failing to review the risks of the HLP with the patients; (5) failing to obtain informed consent from any of the patients; and (6) failing to coordinate care with Patients 1 and 2's primary care providers.[3] We briefly discuss each of those determinations and conclude that the board did not legally err, and that its determinations are supported by substantial evidence.

1. *Review of patients' medical and health records*

The board determined, based on the testimony of multiple expert witnesses, that the standard for chiropractic care requires obtaining and reviewing a patient's health history. Additionally, the board noted that, in "[petitioner's] opinion, if a patient is seeking problem-based care, *i.e.*, care for a specific complaint, then a chiropractor would need to review the patient's medical history." The board also determined that the Oregon Chiropractic Practices and Utilization Guidelines—which are the board's "attempt to provide a guideline for assuring that quality and competence are rendered to patients"—provide that a chiropractor should perform an "intake interview" or initial "patient consultation," which includes reviewing "a history of presenting illness, [and] past health history."

---

[3] In his briefing, petitioner contends that the board also determined that petitioner engaged in unprofessional or dishonorable conduct, in part, for "failing to perform psychosocial assessments" of Patients 1, 2, and 3. However, we understand the board to have made the opposite determination: The board determined that "[t]here was no evidence that [petitioner's] 30-minute interactions with the patients did not constitute a psychosocial assessment."

Applying that standard, the board determined that, "although [petitioner] obtained a health history from Patients 1, 2, and 3 as required by the standards of chiropractic care," the evidence established that petitioner did not "read them and [go] over them." On that basis, the board concluded that petitioner's "lack of careful review of [Patients 1, 2, and 3's] medical and health information *** violated the standards for chiropractic care."

## 2.  *Medical examinations*

The board determined that, "[a]s a chiropractor providing problem-based care, [petitioner] must perform an examination of each patient before allowing their participation in the HLP." That determination was based on, and consistent with, the agreement among several expert witnesses that "there are no set types of examinations required," but rather, "a chiropractor must use his professional judgement to determine the appropriate examinations to perform dependent upon the patient and the presenting condition." The board also determined, based on the opinions of three expert witnesses, that "an initial examination must include [taking] the patient's vitals, which includes at a minimum the height, weight, and blood pressure of the patient."

With respect to Patients 1 and 3, the board determined—based on the evidence adduced in the hearing—that petitioner's post-seminar consultations with Patients 1 and 3 "primarily concerned the HLP services, length, and costs" and "do not amount to an examination." On that basis, the board concluded that "[petitioner's] failure to perform any kind of examination on Patients 1 and 3 violated the standards of chiropractic care."

With respect to Patient 2, the board found that "[petitioner] performed one neuropathy test on Patient 2." But the board determined—based on testimony from three expert witnesses—that "[petitioner's] single test was inadequate to support" the treatment plan he recommended to Patient 2, and that "[petitioner's] failure to perform an examination to support the treatment plan *** violated the standards of chiropractic care."

The board further determined that "[petitioner's] failure to obtain the vitals of Patients 1, 2, and 3 violated the standards of chiropractic care."

### 3.  *Diagnoses*

Three expert witnesses agreed—and on that basis the board determined—that "a chiropractor must determine a diagnosis, or at least a provisional diagnosis, at the initial examination before suggesting a treatment plan."

Applying that standard, the board then determined that, "based upon the cursory nature of the review of the [patients'] health applications and the focus of the consultations on the HLP rather than the patients, [petitioner] failed to make his own diagnoses of Patients 1, 2, and 3's medical conditions," and that "[petitioner's] failure to render a diagnosis for each of these patients violated the standards of chiropractic care."

### 4.  *Review of risks*

The board concluded—based on agreement among the expert witnesses—that it is necessary for a chiropractor "to perform all aspects of the PARQ [(*i.e.*, Procedures, Alternatives, Risks, Questions)] *** before providing treatment" to a patient.[4]

With respect to Patient 2, the board found that she was "taking the prescription medication Coumadin to control her blood-clotting properties to alleviate the risk of strokes and to prevent her from experiencing hemorrhaging events." The board then determined, based on expert testimony, that "Patient 2's condition was not well controlled and

---

[4]  Regarding the PARQ, OAR 811-035-0005(2)(a) provides, in relevant part:

"The patient has the right to informed consent regarding examination, therapy and treatment procedures, alternatives and risks, and answers to questions (PARQ) in terms that they can reasonably understand.

"P – Procedures: examination, diagnosis, therapy, and treatment procedures

"A – Alternatives: alternative options to examination or chiropractic treatment

"R – Risks: risks and benefits associated with examination and/or chiropractic treatment

"Q – Questions: answer any questions patients have regarding the examination or treatment."

subject to significant fluctuation due to changes in her diet," and that certain supplements and foods included in the HLP "increase the possibility of a bleeding event" and can "interfer[e] with the effectiveness of the Coumadin."

With respect to Patients 1, 2, and 3, the board determined—based on expert testimony—that introducing dietary changes or supplements carries "attendant risks for individuals on blood pressure medications, a condition that Patients 1, 2, and 3 had."

In light of those determinations, the board further determined that although petitioner had "rather extensively" discussed the HLP treatment plan with the patients and had "reviewed the alternative available treatments," petitioner "did not review the risks of the HLP" with each of the patients. On that basis, the board determined that "[b]ecause [petitioner] did not review the risks of the HLP with Patients 1, 2, and 3, he did not perform all aspects of a PARQ, which violated the standards of chiropractic care."

5.  *Informed consent*

Related to its determination that petitioner had failed to review the risks of the HLP with the patients, the board concluded that "OAR 811-035-0005(2)(b) requires a chiropractor to perform PARQ in order to obtain informed consent from the patient," and that, "[a]s confirmed by the experts, obtaining informed consent from patients for treatment is also a standard of chiropractic care."[5] On that basis, the board determined that "[b]ecause [petitioner] did not perform all aspects of a PARQ with Patients 1, 2, and 3, he failed to obtain informed consent from any of those patients in violation of OAR 811-035-0005(2) and in violation of the standards of chiropractic care."

6.  *Contacting primary care providers*

The board determined that petitioner was required to coordinate care with Patients 1 and 2's primary care

---

[5]  OAR 811-035-0005(2)(b) provides:

   "Chiropractic physicians shall perform and document a PARQ conference in order to obtain informed consent from the patient prior to examination and treatment. The PARQ conference and informed consent shall be noted within the patient record."

providers (PCP) before introducing dietary changes or supplements.

With respect to Patient 1, the board determined—based both on the testimony of petitioner and an expert witness—that due to Patient 1's comorbid conditions and history of cancer, petitioner was "required to consult with Patient 1's PCP." The board further found that, despite Patient 1's "early termination from the HLP," she was nevertheless "in the HLP for one month before she gave notice of her withdrawal," but "[d]uring that month, [petitioner] made no effort to contact her PCP."

With respect to Patient 2, the board determined—based on agreement among three expert witnesses—that "because of the significant dangers to Patient's health in light of her comorbid conditions and use of Coumadin," it would be "absolutely imperative for a chiropractor to contact the Patient's medical professional to coordinate care before making changes to [the Patient's] diet or recommending the use of supplements."

Based on the above, the board determined that "[petitioner] failed to contact Patients 1 and 2's PCPs during the course of their participation in the HLP, which was a violation of the standards of chiropractic care."

7. *Conclusion as to petitioner's unprofessional and dishonorable conduct*

We conclude that the board did not legally err in its determinations regarding the six ways that petitioner engaged in unprofessional or dishonorable conduct and that its determinations are supported by substantial evidence.

C. *Third Assignment of Error: Gross Negligence*

In his third assignment of error, petitioner contends that the board's determination that he engaged in gross negligence is "contrary to law and is unsupported by substantial evidence." We disagree.

The board determined that petitioner engaged in gross negligence by "abdicat[ing] his duties as a chiropractor to the unlicensed health coaches." The board's standard for "gross negligence" is "negligence marked by a total or

nearly total disregard for the rights of others and by total or nearly total indifference to the consequences of an act."

Here, petitioner does not challenge the board's standard for gross negligence; instead, petitioner challenges the board's "application of that standard to these facts," arguing that "what the board finds in the Final Order is demonstrably not gross negligence."

The board's gross negligence determination was based on several underlying determinations. For one, the board determined that

> "[a]s the chiropractor, it is [petitioner's] duty to review the changes to the health condition of the HLP participants and determine what action, if any, should be taken. Such review and determination is not the prerogative of an unlicensed individual, but [petitioner] permitted the unlicensed [health coaches] to make these decisions, which put the health and safety of the HLP participants, including Patients 1 and 2, at risk."

Additionally, the board determined—based on evidence about the functions of the HLP health coaches—that petitioner not only abdicated "his duties as a chiropractor to unlicensed individuals, he abdicated his duties to individuals who did not have, and were not required to have, a medical or nutritional background." The board further determined that there were instances of "health coaches' failures to inform [petitioner] of the illnesses, emergency room episode, and the new diagnoses of Patients 1 and 2" by their PCPs, and that those failures "demonstrated the failure of [petitioner's] training program" for the HLP's health coaches.

The board also found that "all three patients were elderly and had comorbid conditions *** that could be adversely affected by the dietary changes and supplements recommended by the HLP." And, specifically with respect to Patient 2, the board found that three expert witnesses recognized that "[b]ecause of her use of Coumadin, the HLP recommendations placed her health and safety at significant risk because such dietary and supplement changes could result in hemorrhaging or clotting events that could cause a stroke."

Based on the above, the board ultimately determined that

> "[petitioner's] abdication of his duties to the unlicensed health coaches demonstrated his nearly total disregard for the rights of others (his patients to whom he owed a professional duty of care and whose health and safety were at risk due to his negligence) and his nearly total indifference to the consequences of his action (patients who are left to experience adverse changes in their health condition without any oversight from the health care professional)."

We conclude that the board's determination that petitioner engaged in gross negligence is not legally erroneous and is supported by substantial evidence.

D. *Fourth Assignment of Error: Discipline Relating to Patient 3*

In his fourth assignment of error, petitioner contends that he "cannot be disciplined for conduct relating to [Patient 3,] a person who neither wanted nor accepted respondent's care or treatment." More specifically, petitioner contends that Patient 3 "was adamant that she *** was not and did not want to be respondent's patient," and that "[t]here is no basis for discipline where the evidence is unequivocal that the so-called patient neither wanted nor expected" to receive care from petitioner. Thus, petitioner contends, the board's determination was not supported by substantial evidence. We disagree.

As the board noted in its final order, OAR 811-010-0005(9) defines "patient" to mean "any person who is examined, treated, or otherwise provided chiropractic services whether or not the person has entered into a physician/patient relationship or has agreed to pay a fee for services."

Here, the board explained that "just because Patient 3 did not consider [petitioner] to be her doctor does not control the reality of whether" she was petitioner's patient. Instead, the board further explained, whether she had become petitioner's patient "is determined by the totality of the interaction between [petitioner] and Patient 3."

In examining the interaction between petitioner and Patient 3, the board determined that Patient 3 was

petitioner's patient based on a number of factual findings: Patient 3 attended petitioner's fibromyalgia seminar; she paid for and received a consultation with petitioner; she completed the HLP application; she divulged private health information to petitioner; she discussed with petitioner goals of reducing her fibromyalgia; and she was evaluated by petitioner for her suitability to participate in petitioner's HLP. Based on those facts, the board stated that the evidence supports a determination "that [petitioner] established a doctor-patient relationship with Patient 3," and that as a result, "[petitioner] had a duty to provide the minimum standard of chiropractic care and comply with the laws and rules governing his profession."

We conclude that substantial evidence supports the board's determination that Patient 3 was petitioner's patient; consequently, the board could subject petitioner to disciplinary action for his conduct relating to Patient 3.

## IV.   CONCLUSION

In sum, we conclude that the determinations made by the board and challenged by petitioner on review are not legally erroneous and are supported by substantial evidence. Accordingly, we affirm the final order of the board.

Affirmed.