Argued and submitted February 7, reversed and remanded June 8, 2022

TIMBER TOWN LIVING, INC.,
*Petitioner,*

*v.*

DEPARTMENT OF HUMAN SERVICES,
*Respondent.*

Department of Human Services
2020DHS12708; A175192

513 P3d 28

Petitioner operates a residential care facility that is licensed and regulated by the Department of Human Services (DHS). After a contested case hearing, DHS issued a final order concluding that petitioner violated DHS rules by failing to timely and appropriately respond to changes in a resident's condition after a witnessed fall in the dining room. Two days after the fall, the resident was sent to the hospital and determined to have a hip fracture. DHS deemed the violation to be "Level 4," which is the most severe violation level, based on the resident having suffered "serious harm" as defined in ORS 441.731(2)(d)(E). Petitioner seeks judicial review of DHS's final order. Petitioner does not contest that a violation occurred, but it contends that DHS misconstrued ORS 441.731(2)(d)(E) in concluding that the violation was "Level 4." *Held*: DHS misconstrued ORS 441.731 (2)(d)(E) in concluding that a 48-hour loss of function constitutes a "long-term" loss of function.

Reversed and remanded.

Clark E. Rasche argued the cause for petitioner. Also on the briefs was Watkinson Laird Rubenstein, P.C.

Patricia G. Rincon, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Tookey, Presiding Judge, and Aoyagi, Judge, and Armstrong, Senior Judge.

AOYAGI, J.

Reversed and remanded.

Tookey, P. J., dissenting.

**AOYAGI, J.**

Petitioner operates a residential care facility that is licensed and regulated by the Department of Human Services (DHS). After a contested case hearing, DHS concluded that petitioner had violated certain DHS rules in its handling of a resident's fall-related injury. DHS deemed the violation to be "Level 4," based on the resident having suffered "serious harm" as defined in ORS 441.731(2)(d)(E), and it imposed a $2,500 civil penalty. Petitioner seeks judicial review of the final order, challenging DHS's determination that the violation severity was Level 4. We reverse and remand.

FACTS

On a Tuesday at 3:00 p.m., a resident fell in the dining room of petitioner's residential care facility. Petitioner's staff monitored her over the next two days, during which time she experienced pain and swelling, could not lift her right foot, and was unable to stand. On Thursday at 4:45 p.m., the resident was transported to the hospital, where she was determined to have a hip fracture that required surgery.

Petitioner notified DHS of the incident. After investigation, DHS issued a Notice of Proposed Civil Penalty. The notice described the incident as petitioner having "failed to assess and intervene" with respect to the resident's change of condition after her witnessed fall, which resulted in the resident "experiencing unreasonable discomfort for approximately 48 hours before being transported to the hospital and diagnosed with a hip fracture." The notice further advised that DHS had concluded that petitioner violated OAR 411-054-0027(1)(f) and (r); OAR 411-054-0028(2); OAR 411-054-0036(2)(g); and OAR 411-054-0040(1)(b) and (c). Finally, the notice stated that DHS was proposing a $2,500 civil penalty for a Level 4 violation, based on the resident having suffered "serious harm" as defined in ORS 441.731(2)(b)(D).

Petitioner requested a contested case hearing. An administrative law judge (ALJ) concluded that DHS had proved the violation by a preponderance of the evidence. In particular, the ALJ concluded that petitioner had committed abuse by neglect in failing to timely and appropriately respond to changes in the resident's condition over the

48 hours after her fall, which resulted in "physical harm" and "prolonged, unreasonable discomfort." *See* OAR 411-020-0002(1)(b) (defining "abuse" to include "neglect" that "[r]esults in physical harm, significant emotional harm, unreasonable discomfort, or serious loss of personal dignity to the adult"). As for the proposed civil penalty, the ALJ agreed with DHS that the violation was a Level 4 violation—because the resident suffered "serious harm," specifically a "long-term" loss of physical function[1]—and that it was therefore permissible to impose a $2,500 penalty. *See* ORS 441.731(3)(a)(D) ("For a Level 4 violation, the director may impose a civil penalty in an amount no less than $1,500 per violation, not to exceed $2,500 per violation."). DHS issued a final order adopting the ALJ's proposed order in its entirety and imposing a $2,500 civil penalty.

Petitioner seeks judicial review. Petitioner does not contest that the violation occurred. The only issue on review is whether DHS erred in concluding that the violation qualified as Level 4.

## LEGAL ANALYSIS

DHS has authority to impose civil penalties on residential care facilities for violating DHS rules. *See* ORS 441.731. As noted, petitioner does not contest that it violated DHS rules in its handling of the resident's fall, which includes not contesting that the resident experienced physical harm and unreasonable discomfort. The only issue on review is whether DHS erred in concluding that the violation qualified as Level 4.

When imposing a civil penalty, DHS is required to consider certain factors, including the "severity" of the violation. ORS 441.731(2)(a)(D). Violation severity is defined by ORS 441.731(2)(b), which creates four levels of severity: (1) a Level 1 violation "results in no actual harm or in potential for only minor harm"; (2) a Level 2 violation "results in minor

---

[1] In the final order, DHS did not expressly find that the resident lost "physical function." DHS argues that such a finding can be implied, whereas petitioner argues that it cannot be implied because DHS conflated pain with loss of physical function. Given our disposition, we assume without deciding that DHS implicitly found that the resident experienced a loss of physical function. The evidence would allow such a finding.

harm or potential for moderate harm"; (3) a Level 3 violation "results in moderate harm or potential for serious harm"; and (4) a Level 4 violation "results in serious harm or death." As used in ORS 441.731(2)(b), "'[h]arm' means a measurable negative impact to a resident's physical, mental, financial or emotional well-being." ORS 441.731(2)(d)(B). "'Minor harm' means harm resulting in no more than temporary physical, mental or emotional discomfort or pain without loss of function, or in financial loss of less than $1,000." ORS 441.731(2)(d)(C). "'Moderate harm' means harm resulting in temporary loss of physical, mental or emotional function, or in financial loss of $1,000 or more, but less than $5,000." ORS 441.731(2)(d)(D). "'Serious harm' means harm resulting in long-term or permanent loss of physical, mental or emotional function, or in financial loss of $5,000 or more." ORS 441.731(2)(d)(E).

In this case, DHS determined that petitioner's violation was a Level 4 violation because it resulted in "serious harm" to the resident, specifically a long-term loss of physical function, rather than "minor harm" (temporary pain with no loss of function) or "moderate harm" (temporary loss of function). In explaining its severity decision, DHS did not expressly engage in any statutory analysis. Rather, it simply pointed to a hypothetical example of a Level 4 violation included in an "interpretative guide" to DHS rules titled *Compliance Framework Guide for Community Based Care (Residential Care and Assisted Living)*. In the hypothetical, a resident falls, the facility fails "to seek medical attention until the resident complain[s] of pain for several days," and the resident is then sent to the hospital and found to have a hip fracture. In its final order, DHS agreed with the ALJ that that hypothetical was materially indistinguishable from the facts of this case, while also acknowledging (in response to an exception raised by petitioner) that DHS's interpretative guide is only that and "has not been adopted as a rule."

On judicial review, petitioner contends that DHS misconstrued ORS 441.731(2)(d)(E) in two regards—first, by conflating pain with "loss of function" and, second, by treating 48 hours as "long-term." Before considering the merits of petitioner's argument, we address a threshold procedural issue, which is petitioner's noncompliance with ORAP 5.45. The opening brief does not comply with ORAP 5.45 in several

respects, including failing to state the assignment of error in the manner required. "Compliance with ORAP 5.45 is not a matter of mere form; it is crucial to our ability to review trial court rulings for error and to determine whether the appellant's claims of error were preserved below." *Village at North Pointe Condo. Assn. v. Bloedel Constr.*, 278 Or App 354, 359, 374 P3d 978, *adh'd to as modified on recons*, 281 Or App 322, 383 P3d 409 (2016) (explaining that noncompliance with ORAP 5.45 may render a claim of error unreviewable). At the same time, if a claim of error is discernible from the opening brief, we will typically address it, notwithstanding noncompliance with ORAP 5.45. *See id.* at 361 (stating as much and addressing a discernible claim of error). That is the case here. Petitioner argues in its opening brief that DHS misconstrued "loss of function" and "long-term" in ORS 441.731(2)(d)(E), which led DHS to incorrectly conclude that the violation was a Level 4 violation. The claim of error is discernible, it was preserved below, and DHS has had a fair opportunity to respond on appeal (and has done so). We therefore proceed to the merits.

We begin with petitioner's argument that DHS misconstrued "long-term" in ORS 441.731(2)(d)(E), which proves dispositive. A Level 4 violation is one that "results in serious harm or death." ORS 441.731(2)(b)(D). "'Serious harm' means harm resulting in *long-term or permanent* loss of physical, mental or emotional function, or in financial loss of $5,000 or more." ORS 441.731(2)(d)(E) (emphasis added). In its final order, DHS concluded that petitioner's violation in this case was a Level 4 violation because the resident suffered a "long-term" loss of physical function. That is, DHS concluded that a 48-hour loss of physical function qualifies as "long-term" under ORS 441.731(2)(d)(E). Petitioner takes the view that that is legally incorrect, as a matter of statutory construction, because "long-term" is an inexact term reflecting a complete legislative policy, and the legislature did not intend "long-term" to mean a period as short as 48 hours. In response, DHS contends that "long-term" could be a delegative term but that, even if it is an inexact term, it is correctly construed to encompass a 48-hour loss of function.

Statutory construction is inherently a question of law. *Bergerson v. Salem-Keizer School District*, 341 Or 401,

411, 144 P3d 918 (2006). To construe a statute, we generally examine the text, context, and any useful legislative history of which we are aware, with the goal of discerning the legislative intent. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). However, "depending on the nature of the statutory term at issue, an administrative agency's construction of a statute * * * may be entitled to a measure of deference." *OR-OSHA v. CBI Services, Inc.*, 356 Or 577, 585, 341 P3d 701 (2014). Whether we give any deference to the agency's construction depends on whether the disputed term is exact, inexact, or delegative, which is "itself a question of statutory construction, requiring us to examine the text of the statute in its context." *Id.* at 588 (noting further that "a single statutory phrase may contain terms of more than one type").

"'Exact' terms are those that impart precise meaning and, in effect, require no interpretation at all." *Karjalainen v. Curtis Johnston & Pennywise, Inc.*, 208 Or App 674, 680, 146 P3d 336 (2006), *rev den*, 342 Or 473 (2007). "'Inexact' terms are less precise" and are therefore open to different interpretations, but they are still complete expressions of legislative intent, and we apply the ordinary rules of statutory construction to discern the legislative intent. *Id.*; *Springfield Education Assn. v. School Dist.*, 290 Or 217, 224-25, 621 P2d 547 (1980). "'Delegative' terms are those that express 'non-completed legislation which the agency is given delegated authority to complete.'" *Karjalainen*, 208 Or App at 680 (quoting *Springfield*, 290 Or at 228). We review an agency's construction of a delegative term to determine whether it is "within the range of discretion allowed by the more general policy of the statute." *Springfield*, 290 Or at 229.

Here, we agree with petitioner that "long-term" is an inexact term. DHS floats the idea that it could be delegative, but nothing about the text in context suggests to us that the legislature intended "long-term" to "express non-completed legislation" that DHS was "given delegated authority to complete." *Id.* at 228. To the contrary, several aspects of the text in context indicate that the legislature intended "long-term" to convey a complete legislative policy judgment, albeit inexactly. There is the fact that "long-term" is part of an express statutory definition of another term ("serious harm"), which tends to suggest that the legislature was trying to pin down

the meaning of "serious harm," not delegate it to DHS to decide. There is also the fact that "long-term" is a common word with a fairly straightforward, albeit inexact, meaning. *See Webster's Third New Int'l Dictionary* 1334 (unabridged ed 2002) (defining "long-term" to mean "extending over or involving a relatively long period of time"). Relatedly, "long-term" appears in a statutory section that contains three common words—"temporary," "long-term," and "permanent"— that together create a durational spectrum for losses of function.

Relevant legislative history, although slim, also supports the conclusion that "long-term" in ORS 441.731(2)(b) is an inexact term. In discussing the proposed bill, Speaker of the House of Representatives Tina Kotek asked whether the definitions in section 4 (now codified as ORS 441.731) would apply to the "immediate jeopardy" provisions in section 5 (now codified as ORS 441.736). Audio Recording, Joint Subcommittee on Capital Construction, HB 3359, July 1, 2017, at 45:20 (inquiries by Rep Tina Kotek), https://olis.oregonlegislature.gov (accessed May 24, 2022). Marisa James from the Office of Legislative Counsel responded that the definitions in section 4 apply only to section 4 and that, to the extent the same terms appear in section 5, DHS would have "discretion" in interpreting those terms for purposes of section 5 and would "not be bound" by how they are defined for section 4. *Id*. at 45:40 (response by Marisa James). Implicit in the foregoing exchange is a recognition by both speakers that the terms in section 4 have specific meanings for purposes of section 4—which supports the conclusion that they are not delegative in ORS 441.731(2)(b).

Having concluded that "long-term" is an inexact term, the next question is what the legislature intended it to mean. By its nature, "long-term" is relative, as its dictionary definition recognizes. *Webster's* at 1334 ("extending over or involving a relatively long period of time"). Consequently, what is "long-term" for a person in their 80s may differ from what is "long-term" for a person in their 20s. That reality means that there will no doubt be cases in which it is difficult to be certain whether a particular period of time comes within the legislature's intended meaning of "long-term." This is not one of them.

What is apparent from the statute—and consistent with the words' common meanings—is that the legislature intended "long-term" to be more like "permanent" and less like "temporary." For purposes of ranking the severity of a violation, the legislature defined both "minor" and "moderate" harm by reference to "temporary" discomfort, pain, or loss of function. *See* ORS 441.731(2)(d)(C) ("'Minor harm' means harm resulting in no more than temporary physical, mental or emotional discomfort or pain without loss of function ***."); ORS 441.731(2)(d)(D) ("'Moderate harm' means harm resulting in temporary loss of physical, mental or emotional function ***."). By contrast, it defined "serious harm" by reference to "long-term or permanent" loss of function. ORS 441.731(2)(d)(E).

The bundling of "long-term or permanent" in counterpoint to "temporary" suggests that the legislature was using "long-term" in a sense more akin to "permanent" and unlike "temporary." That suggestion is further reinforced by the fact that "serious harm" itself is bundled with "or death" in the definition of a Level 4 violation. ORS 441.731(2)(b)(D) (defining "Level 4" as a violation that "results in serious harm or death"). It seems highly unlikely that the legislature intended a Level 4 violation, which is the most severe violation, to capture everything from a 48-hour loss of function up to death. To the contrary, given the context, it seems far more likely that the legislature included "long-term" as an alternative to "permanent" in order to capture situations in which a person's loss of function might not be literally "permanent" but is expected to be sufficiently "long-term," as that word is commonly understood, to warrant treating it the same as a "permanent" loss of function. Otherwise, the legislature could have simply used "temporary" and "permanent," which themselves would provide a complete spectrum.[2] By making the categories "temporary" and "long-term or permanent," the legislature expanded the latter category, but we disagree with DHS that it intended to expand it so far as to include as short an amount of time as 48 hours.

---

[2] *See Webster's* at 1683 (defining "permanent" to mean "continuing or enduring (as in the same state, status, place) without fundamental or marked change : not subject to fluctuation or alteration : fixed or intended to be fixed : LASTING, STABLE"); *id.* at 2353 (defining "temporary" to mean "lasting for a time only : existing or continuing for a limited time : IMPERMANENT, TRANSITORY").

RESPONSE TO DISSENT

We briefly address the dissent. The dissent appears to view anything less than a "Level 4" designation as an affront to the dignity of the resident who received delayed care for her hip fracture. *See* 320 Or App at 164, (Tookey, P. J., dissenting). That view is misguided. The question before us is one of statutory construction, specifically what the legislature intended in distinguishing "temporary," "long-term," and "permanent" losses of physical, mental, or emotional function for purposes of categorizing a violation as Level 1, 2, 3, or 4. For the reasons already described, the legislature did not intend a "long-term" loss of function to encompass a 48-hour loss of function.

The additional facts included in the dissent do not bear on the statutory construction issue before us, and so we do not comment on them, except to note that they are both accurate and selective. *See id*. at 165-67. As for preservation, *see id*. at 167-69, the claim of error was adequately preserved, applying normal preservation principles, and DHS does not contend otherwise (beyond noting petitioner's failure to comply with ORAP 5.45). As for petitioner's noncompliance with ORAP 5.45, *see id*., we have already addressed that issue— in short, the claim of error is discernible, DHS understood and responded to it, and it would be putting form over function to refuse to reach the merits in these circumstances.

Regarding the merits, we disagree that the meanings of "temporary," "long-term," and "permanent" vary depending on the type of function that was lost. *See id*. at 161-62. ORS 441.731 refers generally to any loss of physical, mental, or emotional function. Nothing in the text, context, or legislative history suggests that the *specific* function at issue is relevant to whether the loss is "temporary," "long-term," or "permanent." A "temporary" loss does not become "permanent" by virtue of the perceived importance of the function at issue, any more than a "permanent" loss become "temporary" by virtue of the perceived importance of the function at issue. The same is true of a "long-term" loss. All three terms are durational in nature. The legislature chose to grade the severity of harm from a violation by reference to whether the resident experienced *any* loss of function and, if so, the

duration of the loss—not based on the quality of the loss—and it is not for us to try to superimpose a qualitative evaluation of the relative "importance" of any particular physical, mental, or emotional function to any particular person.

Lastly, the issue before us is purely one of statutory construction. We have no occasion to assess whether the factual findings in the final order are supported by substantial evidence—because no one has challenged them—nor do we have occasion to assess whether the final order adequately explains the connection between DHS's factual findings and its legal conclusions—because no one has claimed that it does not. *See Jenkins v. Board of Parole*, 356 Or 186, 195-96, 335 P3d 828 (2014) (explaining that, in addition to stating factual findings and legal conclusions, an agency's order must demonstrate substantial reason, "[t]hat is, the agency must articulate a rational connection between the facts and the legal conclusions it draws from them" (internal quotation marks omitted)). We express no view on issues that have never been raised. *See* 320 Or App at 173 (Tookey, P. J., dissenting) (expressing the view that the final order is supported by substantial evidence and demonstrates substantial reason).

## CONCLUSION

Accordingly, we conclude that DHS misconstrued the statute when it concluded that a 48-hour loss of function constituted a "long-term" loss of function within the meaning of ORS 441.731(2)(d)(E), such that petitioner's violation was a Level 4 violation. We remand for any further action that DHS may properly take under the correct construction of the statute. *See* ORS 183.482(8)(a) (providing that, upon judicial review in a contested case, where we determine "that the agency has erroneously interpreted a provision of law and that a correct interpretation compels a particular action," we "shall" either "[s]et aside or modify the order" or "[r]emand the case to the agency for further action under a correct interpretation of the provision of law").[3]

Reversed and remanded.

---

[3] The parties appear to disagree as to what can properly be done on remand, given the particular posture of this case. Their arguments on that point are undeveloped, however, and we express no opinion on the matter.

**TOOKEY, P. J.,** dissenting.

"[I]t is the policy of this state to \*\*\* [p]romote the autonomy of residents of Oregon's community-based care facilities and accord them honor [and] dignity[.]"

Or Laws 2017, ch 679, § 1.

This case involves B, an 83-year-old woman who suffers from Alzheimer's disease and who lives in petitioner's residential-care facility. According to the majority, it was error for the Department of Human Services (DHS) to conclude that B suffered "serious harm" when she fell and fractured her right hip at petitioner's facility and was not transported to the hospital for more than two days, during which time she was unable to raise or bear weight on her injured leg and experienced continuous and ever-increasing pain such that she eventually could not be moved without "crying out in pain" and "beg[ging] for care staff to please stop moving her." *See* 320 Or App at 162. I disagree with the majority's conclusion that B's injury did not constitute "serious harm" under ORS 441.731(2)(d)(E),[1] and I therefore write separately to dissent.

Petitioner seeks judicial review of a final order issued by DHS. The final order imposed on petitioner a civil penalty of $2,500 based on a determination that B had suffered "serious harm" as that term is defined in ORS 441.731 (2)(d)(E). On review, petitioner challenges that determination, arguing that DHS incorrectly construed the term "serious harm," and that the record does not support a finding that B suffered a long-term loss of physical function. For the reasons explained below, I would affirm.

We review an agency order in a contested case for errors of law and substantial evidence. *Gala v. Board of Chiropractic Examiners*, 313 Or App 664, 665, 496 P3d 1122 (2021) (citing ORS 183.482(8)(a), (c)). "Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding." *Id.* (internal quotation marks omitted). "In addition

---

[1] ORS 441.731(2)(d)(E) provides, "'Serious harm' means harm resulting in long-term or permanent loss of physical, mental or emotional function, or in financial loss of $5,000 or more."

to reviewing for substantial evidence, we also review the [agency's] order for substantial reason." *Id.* (internal quotation marks omitted). Substantial reason exists when the agency "provided a rational explanation of how its factual findings lead to the legal conclusions on which the order is based." *Id.* (internal quotation marks omitted). In conducting our review, "the court shall not substitute its judgment for that of the agency as to any issue of fact." *Id.* (citing ORS 183.482(7)). In accordance with that standard, we take the following facts from the unchallenged findings in the DHS final order—which adopted an administrative law judge's proposed order in its entirety—and from additional evidence in the record.

## I.   FACTUAL & PROCEDURAL BACKGROUND

Petitioner operates a residential-care facility (facility) licensed and regulated by DHS. B, an 83-year-old woman diagnosed with Alzheimer's disease, is a resident of petitioner's facility. B requires assistance to walk on uneven surfaces or navigate steps, and facility staff encouraged B to use a walker or wheelchair.

At about 3:00 p.m. on June 4, 2019, B was seated in a wheelchair in the facility's dining room. She stood up from the wheelchair, lost her balance, and fell from a standing position onto her bottom right side, also striking her head. Consequently, B suffered increasing pain and immobility, as evidenced by the following progress notes kept by facility staff over a period spanning three days:

- 06/04/2019 3:15 PM: "Fall investigation; incident occurred at 3 PM 6/4/19. *** [B] denies any pain until R leg is manipulated."

- 06/04/2019 9:44 PM: "[B complained of] pain to her lower right side hip/upper leg area. She is unable to lift her right foot off the floor due to hip/leg pain. *** [B] has been in continual pain since this incident."

- 06/05/2019 5:20 AM: "[B] has complained of pain in her right leg ***. No bruising but her leg is swollen

and when care staff changed her she was in a lot of pain saying 'ouch' and 'that is hurting me,' and she was unable to stand."

- 06/05/2019 1:33 PM: "[B] is showing signs of pain during transfers. She is unable to help stand at this time, [and] she was unable to hold her food and drinks at lunch time."

- 06/05/2019 10:11 PM: "[B] lays without movement and her brow is furrowed. She expresses severe pain to her right side when roll changed and with transfer attempts. *** She did not get up for dinner and did not eat during entire swing shift."

- 06/06/2019 6:12 AM: "[B] has been in a lot of pain throughout this shift, unable to move positions or move her right leg without pain/crying at which time she begs for care staff to please stop moving her."

- 06/06/2019 12:53 PM: "[B] is in severe pain when roll changed[;] she yells when rolled and is unable to stand. She did not eat breakfast or lunch ***. She had 24 oz of fluid."

- 06/06/2019 1:17 PM: "[B] has increasing pain to R hip area. *** [B] is now crying out in pain when rolled or attempting to get her up from bed."

- 06/06/2019 9:21 PM: "[B] again lays without movement and responds only with yelling and wincing when roll changed. She drank 2 oz water with straw at the beginning of shift. Her cognition is poor. [B] was sent to ER at 3:45 p.m. for eval ***. [B] has a fractured hip and will remain in the hospital to have surgery."

- As those notes indicate, B suffered from increasing pain, missed meals, and lost the ability to lift, walk with, or stand on her right leg, and, on the third day, B was eventually taken to the ER, where she underwent surgery to repair her fractured hip."

Shortly thereafter, petitioner notified Adult Protective Services (APS) about B's fall and broken hip, and APS opened an investigation. As a result of the APS investigation, DHS issued a Notice of Proposed Civil Penalty. The Notice stated that petitioner's failure to timely intervene after B's fall constituted abuse and was a "Level 4 violation," which corresponded to a civil penalty of $2,500 under ORS 441.731 (3)(a)(D). Petitioner then requested a contested case hearing. At that hearing, a DHS corrective action coordinator testified that B suffered a "[loss of] physical function in that she was unable to bear weight on her leg," and that, following B's hip surgery, DHS "d[id]n't have anything from the hospital or anything that states what happened to [B] afterwards."

Following the contested case hearing, the ALJ issued a Proposed Order, concluding that DHS had proved the abuse violation by a preponderance of the evidence, and proposing that DHS impose a $2,500 penalty because B "suffered serious, prolonged harm" and because "[petitioner] has a history of similar prior violations."[2] DHS subsequently issued a Final Order, adopting the Proposed Order in its entirety, and imposing the $2,500 civil penalty for petitioner's abuse violation.

Now, petitioner requests judicial review of the DHS final order, "seek[ing] reversal of [DHS]'s interpretation of the non-delegative statutory provision of 'serious harm'" contained in ORS 441.731(2)(d)(E).

## II.  ANALYSIS

A.  *Failure to Comply with ORAPs*

Preliminarily, I note—as does the majority—that petitioner does not comply with multiple of this court's procedural requirements for judicial review.[3] For one, "Assignments of error are *required* in all opening briefs," and

---

[2] The record shows that petitioner's facility had a history of 14 substantiated violations in the 12-month period preceding the violation involving B, including one substantiated violation in which petitioner had, as in this case, failed to timely or appropriately intervene when a resident's condition changed.

[3] Regarding preservation, DHS points in its briefing to "the preservation requirement in ORAP 5.45(1)," and notes that "[petitioner] does not address whether or how the arguments it raises on judicial review were preserved in the underlying contested case proceedings."

"[e]ach assignment of error *must* be separately stated under a numbered heading." ORAP 5.45(1), (2) (emphases added). Petitioner's briefing neither states an assignment of error, nor includes any such headings. In addition, to obtain judicial review, "[e]ach assignment of error must demonstrate that the question or issue presented by the assignment of error timely and properly was raised and preserved" below and must be set forth "[u]nder the subheading 'Preservation of Error.'" ORAP 5.45(4)(a). Again, petitioner's briefing neither contains such a subheading, nor does it indicate that the issue was preserved or where in the record the court should look to determine whether the argument raised in the petition was, in fact, raised below. After reviewing the record, it appears to me that petitioner contended below that the harm to B was only temporary and would thus constitute only "minor harm" or "moderate harm" under ORS 441.731(2)(d)(C) or (D); however, I am not satisfied that petitioner also argued below, as it does on review, that DHS *misconstrued* the term "serious harm"—the latter argument being materially different from the former.

This court's procedural rules state that "[t]he court may decline to consider any assignment of error that requires the court to search the record to find the error or to determine if the error properly was raised and preserved." ORAP 5.45(4)(a). Those rules also state, "No matter claimed as error will be considered on appeal *unless the claim of error was preserved in the lower court and is assigned as error in the opening brief in accordance with* [*ORAP 5.45*]." ORAP 5.45(1) (emphasis added). As the majority correctly observes, compliance with those rules "is not a matter of mere form," 320 Or App at 158; indeed, the "touchstone" of the preservation rule is "procedural fairness to the parties and to the [lower tribunal]," *Peeples v. Lampert*, 345 Or 209, 220, 191 P3d 637 (2008), and "the reason for the rule is not merely to promote form over substance but to promote efficient administration of justice," *John Hyland Const., Inc. v. Williamsen & Bleid, Inc.*, 287 Or App 466, 473, 402 P3d 719 (2017).

Here, petitioner did not adequately establish that its argument was preserved and did not assign any error in its opening brief. Because petitioner has not satisfied those fundamental requirements to qualify for review—and

in light of the "touchstone" of "procedural fairness" to the opposing party and the lower tribunal—I do not agree with the majority that the matter raised in petitioner's brief should be considered by this court.

B.  *B suffered "serious harm" under ORS 441.731(2)(d)(E).*

Putting aside those procedural defects, I also disagree with the majority's conclusion that "DHS misconstrued the statute when it concluded that a 48-hour loss of function constituted a 'long term' loss of function within the meaning of ORS 441.731(2)(d)(E)." 320 Or App at 163.

As framed by petitioner, the issue on review is whether DHS erred by concluding that B suffered "serious harm" as that term is used in ORS 441.731(2)(d)(E). Specifically, petitioner argues that "serious harm" requires a "long term" loss of function, and that DHS misconstrued "long term" when it "found that [B] suffered a 'long term' loss of physical function because she allegedly suffered increased pain levels for about 48 hours." Put simply, petitioner argues that "increased pain for that short period" does not constitute a "long term" loss of physical function.

Petitioner's argument centers on the meaning of "long term" as used in ORS 441.731(2)(d)(E). "Determining the meaning of a statute ultimately is a question of law." *OR-OSHA v. CBI Services, Inc.*, 356 Or 577, 585, 341 P3d 701 (2014). But, "depending on the nature of the statutory term at issue, an administrative agency's construction of a statute nevertheless may be entitled to a measure of deference." *Id.* "Whether the agency's construction is entitled to such deference depends on whether the disputed term is exact, inexact, or delegative." *Id.* Here, I do not disagree with the majority's conclusion that "long term" is an inexact term and, as such, we "examine the meaning of the statute without deference to the agency's construction."[4] *Id.*

---

[4] In *Springfield Education Assn. v. School Dist.*, 290 Or 217, 621 P2d 547 (1980), the Supreme Court classified statutory words and phrases into three categories, each of which triggered a different degree of deference to an agency's construction of that word or phrase. *See* 290 Or at 224-30. Under *Springfield*, agency construction of an inexact term "may be given an appropriate degree of assumptive validity[.]" More recently, however, the Supreme Court has expressed that construction of an inexact term is reviewed without deference to an agency's construction. *See, e.g.*, *Coos Waterkeeper v. Port of Coos Bay*, 363 Or 354, 360,

To discern the meaning of the statute most likely intended by the enacting legislature, we examine its text, context, and any relevant legislative history. *Id.* at 584-85.

The text of ORS 441.731 provides, in relevant part:

"(1)  The Director of Human Services may impose a civil penalty under ORS 441.710 on a residential care facility or a long term care facility pursuant to this section.

"* * * * *

"(2)(b)  The director shall assess the severity of a violation using the following criteria:

"* * * * *

"(D)  Level 4 is a violation that results in serious harm or death.

"* * * * *

"(2)(d)  As used in this subsection:

"* * * * *

"(E)  'Serious harm' means harm resulting in *long-term* or permanent * * * *loss of physical* * * * *function*[.]"

(Emphases added.) As noted above, the parties' dispute focuses on the meaning of "long term" as used in paragraph (2)(d)(E). That term is not defined by statute, but its ordinary meaning includes "extending over or involving a relatively long period of time," *Websters Third New Int'l Dictionary* 1334 (unabridged ed 2002), and "lasting for or pertaining to a relatively long period of time," *The New Shorter Oxford English Dictionary* 1623 (3d ed 1993).

The majority notes that, "[b]y its nature, 'long term' is relative, as its dictionary definition recognizes." 320 Or App at 160. I agree; however, the relative nature of "long term" must be considered within the context in which that term is used. In ORS 441.731(2)(d)(E), "long term" is used

_____

423 P3d 60 (2018) ("On review, we interpret the meaning of inexact terms anew, without deference to the agency's interpretation."). We observe, as did Justice Jack Landau, that "mention of deference to agency interpretations of inexact terms simply disappeared from the supreme court's decisions," but "[t]he court has never explained the disappearance of the 'assumptive validity of an agency's interpretation of an inexact term that *Springfield* mentioned.'" Hon. Jack L. Landau, *Oregon Statutory Construction*, 97 Or L Rev 583, 736-37 (2019).

in the context of a residential-care facility's violation that results in an elderly resident's loss of physical function.

That context is important, because whether an elderly person's loss of physical function is "long term" relates, in part, to the particular *kind* of loss involved, not merely the temporal *duration* of that loss; a fairly inconsequential loss of function over a certain period of time might not, relatively speaking, represent a "long term" loss of function, whereas a much graver loss of function over that same period might, relatively speaking, be aptly characterized as "long term." Moreover, had the legislature intended to define the levels of harm purely in terms of temporal duration, I think, as a matter of legislative drafting, it would have provided a quantitative (*e.g.*, "more than 7 days"), rather than qualitative (*e.g.*, "long term") definition, yet the legislature chose not to do so.

Regarding that contextual relativity, illustration would be helpful. Suppose the loss of physical function involves a relatively minor loss spanning three days, such as losing the ability to articulate one's left pinky finger because of a painful but superficial cut. It may be that that loss does not constitute a loss of physical function for "a relatively long period of time." By contrast, where the loss is graver or involves a more essential physical function—such as losing the ability to move one's body without experiencing severe pain, or losing the ability to consume food—a span of three days would, in my view, constitute "a relatively long period of time" in light of the gravity of that particular kind of loss of physical function.

The context of ORS 441.731 provides additional insight. Because judicial review of agency actions involving inexact terms requires the court to "determine whether the agency's action effectuated the legislative policy, as evidenced by the text and context of the statute," *J. R. Simplot Co. v. Dept. of Agriculture*, 340 Or 188, 197, 131 P3d 162 (2006), "[o]ne contextual clue is the legislature's statement of policy," *AFSCME Council 75 v. City of Lebanon*, 360 Or 809, 823, 388 P3d 1028 (2017) (citing *U.S. National Bank v. Boge*, 311 Or 550, 560-61, 814 P2d 1082 (1991) (express purpose statement may be considered as statutory context)).

In the very same enactment that created ORS 441.731—authorizing DHS to issue civil penalties directed at residential-care facilities and long-term care facilities—the legislature included a statement of policy and legislative findings:

"(1)   The Legislative Assembly finds that:

"(a)   Residents of Oregon's community-based care facilities are valued citizens of this state and deserve to live lives of autonomy and dignity[.]

"* * * * *

"(2)   The Legislative Assembly finds and declares that it is the policy of this state to:

"(a)   Promote the autonomy of residents of Oregon's community-based care facilities and accord them honor [and] dignity and the ability to choose freely how they live their lives so as to encourage maximum independence and fulfillment[.]"

Or Laws 2017, ch 679, § 1. Thus, as stated by the legislature, it is this state's policy that residents of this state's elder-care facilities—who are valued citizens and deserve to live lives of autonomy and dignity—are to be accorded honor and dignity by the care facilities in which they reside. In my view, it is entirely consistent with effectuating that broader legislative policy for DHS to have imposed a "level 4" penalty of $2,500 on petitioner as a consequence for its failure to timely intervene while B suffered increasing pain over a three-day period, missed meals, and lost the ability to lift or stand on her right leg.

Legislative history relevant to ORS 441.731(2)(d)(e) is, as the majority observes, "slim," 320 Or App at 160, and, in my view, is not helpful to resolution of the issue in this case.[5]

In light of the foregoing, I would conclude that, as evidenced by the statutory text and context, DHS's

---

[5] Though the majority points to a brief exchange between a single legislator and a nonlegislator witness during a subcommittee meeting, 320 Or App at 160, it bears remembering that "the comment of a single legislator at one committee hearing generally is of dubious utility in determining the intent of the legislature in enacting a statute (and the comment of a nonlegislator witness even less helpful)." *Patton v. Target Corp.*, 349 Or 230, 242, 242 P3d 611 (2010).

construction of "serious harm" in ORS 441.731(2)(d)(E) is consistent with effectuating the broader legislative policy underlying that enactment—*viz.*, to value and treat with honor and dignity the residents of this state's elder-care facilities—and, for that reason, DHS did not err. I would further conclude that DHS's determination that B suffered "serious harm" is supported by substantial evidence and substantial reason—namely, that B fell and broke her right hip at petitioner's facility; that petitioner failed to facilitate necessary medical care to B for a period spanning three days; that, during that time, B lost the ability to lift, walk with, or stand on her right leg; that B suffered a loss of eating ability, missing multiple meals; and that B experienced ever-increasing pain and, eventually, could not be moved without "crying out in pain" and "beg[ging] for care staff to please stop moving her."

For those reasons, I disagree with the majority's conclusion that B did not suffer "serious harm" under ORS 441.731(2)(d)(E), and I respectfully dissent.